BONNETT, FAIRBOURN, FRIEDMAN
& BALINT, P.C.
PATRICIA N. SYVERSON (CA SBN 203111)
MANFRED P. MUECKE (CA SBN 222893)
600 W. Broadway, Suite 900
San Diego, California 92101
psyverson@bffb.com
mmuecke@bffb.com
Telephone: (619) 798-4593

BONNETT, FAIRBOURN, FRIEDMAN
& BALINT, P.C.
ELAINE A. RYAN (*To Be Admitted Pro Hac Vice*)
CARRIE A. LALIBERTE (*To Be Admitted Pro Hac Vice*)
2325 E. Camelback Rd. Suite 300
Phoenix, AZ 85016
eryan@bffb.com
claliberte@bffb.com
Telephone: (602) 274-1100

*Attorneys for Plaintiffs*
*Additional Attorneys on Signature Page*

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LORI MYERS, ALISON CULLEN, and ALEXANDER MOUGANIS, On Behalf of Themselves and All Others Similarly Situated,<br><br>Plaintiffs,<br><br>v.<br><br>NESTLE PURINA PETCARE COMPANY, a Missouri company,<br><br>Defendant. | Case No.:<br><br>**CLASS ACTION COMPLAINT FOR:**<br><br>1. VIOLATION OF THE UNFAIR COMPETITION LAW, Business and Professions Code §17200 *et seq.*;<br>2. VIOLATION OF THE CONSUMERS LEGAL REMEDIES ACT, Civil Code §1750 *et seq.*;<br>3. VIOLATION OF THE NEW YORK GENERAL BUSINESS LAW §349; and<br>4. UNJUST ENRICHMENT<br><br>DEMAND FOR JURY TRIAL |

Class Action Complaint

Plaintiffs Lori Myers, Alison Cullen, and Alexander Mouganis bring this action on behalf of themselves and all others similarly situated against Defendant Nestle Purina PetCare Company ("Nestle" or "Defendant"), and state:

## FACTUAL ALLEGATIONS

1.      Nestle Purina PetCare Company ("Nestle" or "Defendant") markets, sells, and distributes tuna cat food products under its Fancy Feast brand.  Nestle is headquartered in St. Louis, Missouri, and is the second largest pet food company in the world and the largest in the United States.

2.      Recognizing that consumers expect its products to be responsibly sourced, Defendant promises consumers that its Fancy Feast tuna products are "Dolphin Safe" by displaying a dolphin safe logo on every product label.[1]  Since the introduction of Defendant's dolphin safe policy, including the last 4 years (the "Class Period"), however, Defendant's Fancy Feast tuna products have not been "Dolphin Safe".

//

//

---

[1] The "Fancy Feast tuna products" include:  (1) Classic Pate Ocean Whitefish & Tuna; (2) Grilled Ocean Whitefish & Tuna in Gravy; (3) Grilled Tuna Feast in Gravy; (4) Flaked Chicken & Tuna Feast; (5) Flaked Tuna & Mackerel Feast; (6) Flaked Tuna Feast; (7) Flaked Chicken & Tuna; (8) Gourmet Naturals Tuna in Gravy; (9) Gourmet Naturals Trout & Tuna Pate; (10) Medleys Tuna Primavera with Garden Veggies & Greens in a Classic Sauce; (11) Medleys Tuna Florentine with Garden Greens in a Delicate Sauce; (12) Medleys Tuna & Shrimp Recipe with Wild Rice in Gravy; (13) Medleys White Meat Chicken & Tuna Recipe with Wild Rice & Spinach in Broth; (14) Medleys Ocean Whitefish & Tuna Florentine Pate with Cheese & Garden Greens; (15) Medleys Tuna Tuscany with Long Grain Rice & Garden Greens in a Savory Sauce; (16) Medleys Shredded Tuna Fare with Garden Greens in a Savory Broth; (17) Wet Cat Food Complement Classic Tuna & Vegetable Broths; (18) Gravy Lovers Ocean Whitefish & Tuna in Sautéed Seafood Flavor Gravy; (19) Purely Fancy Feast Natural Flaked SkipJack Tuna in Delicate Broth; (20) Purely Fancy Feast Natural White Meat Chicken & Flaked Tuna in a Delicate Broth; (21) Purely Fancy Feast Natural Tender Tongol Tuna in a Delicate Broth; (22) Light Meat Tuna Appetizer with Scallop Cat Food Topper in a Delicate Broth; (23) Delights with Cheddar Grilled Tuna & Cheddar Cheese in Gravy; and (24) Creamy Delights Tuna Feast.  Plaintiffs reserve the right to add more products upon completion of discovery.

Class Action Complaint

## **Origin of "Dolphin Safe" Tuna**

3. Prior to the development of modern purse seine fishing techniques, tropical tuna were caught one at a time using traditional pole-and-line methods. NOAA, <u>The Tuna-Dolphin Issue</u>, NOAA Fisheries Southwest Fisheries Science Center (September 2, 2016), *available at* https://swfsc.noaa.gov/textblock.aspx?Division=PRD&ParentMenuId=228&id=1408 (last visited May 3, 2019).

4. But by the 1950's, the development of synthetic netting (that would not rot in tropical waters) and hydraulically driven power-blocks (needed to haul very large nets) made it possible to deploy massive purse-seines (vertical net curtains closed by pulling on a chain located along the bottom to enclose the fish, much like tightening the cords of a drawstring purse) around entire schools of tuna.

5. Recognizing that tuna schools (swimming deeper in the water) often congregate with dolphin schools (swimming at observable depths), fishermen began routinely encircling tuna *and* dolphin schools with purse seine nets and hauling the entire catch aboard.

6. This practice led to millions of dolphins being killed as unintended by-catch.

7. In the late 1980s, the world learned of the large numbers of dolphins indiscriminately killed by tuna fishermen. In 1988, a worldwide telecast showed video images of dolphins being killed in tuna fishing nets.  That video was captured by an undercover environmental activist posing as a ship's cook.  Public outcry was immediate and intense.

8. Heightened public awareness of these mass dolphin deaths led to the development and enhancement of fishing regulations around the world, including a strengthening of the Marine Mammal Protection Act ("MMPA") and the enactment of the Dolphin Protection Consumer Information Act ("DPCIA") of 1990.

Class Action Complaint

9.     Recognizing these indiscriminate fishing methods were also deflating consumers' enthusiasm for tuna products, the major sellers of tuna fish – including Nestle's Friskies Petcare Company, Defendant's predecessor – started promising consumers that they would change their tuna fishing practices to ensure that no dolphins were harmed or killed by their tuna fishing fleets.

10.    In the ensuing 25 years, U.S. tuna sellers, including Defendant, initiated and implemented a widespread and long-term advertising and marketing campaign that continues to this day – representing to consumers that no dolphins were killed or harmed in capturing their tuna, as well as expressing their commitment to sustainably sourcing tuna.

11.    For at least the last 4 years, reasonable consumers expected that all of Defendant's Fancy Feast tuna products are dolphin safe because they have been indoctrinated to believe precisely that by Defendant's and the other tuna companies' highly effective dolphin safety and sustainable fishing practices advertising and marketing campaign.  In fact, 98% of the prepackaged tuna sold today in the U.S. for human consumption is labeled with some "dolphin safe" representation.  Forbes, K. William Watson, <u>'Dolphin Safe' Labels on Canned Tuna Are A Fraud</u> (Apr. 29, 2015), *available at* https://www.forbes.com/sites/realspin/2015/04/29/dolphin-safe-labels-on-canned-tuna-are-a-fraud/#51db16b8295e (last visited May 3, 2019).

12.    Defendant's Fancy Feast tuna products, however, are not dolphin safe.  Nor are they sustainably sourced.  Defendant's dolphin safe representations, as well as Defendant's sustainability representations, are false, misleading, and/or deceptive.

**Defendant's Dolphin Safe Representations**

13.    On every Fancy Feast tuna product, Defendant states that the tuna products are "Dolphin Safe" with a prominent dolphin logo set against a contrasting colored background designed to capture consumers' attention.  The Fancy Feast tuna products also include Defendant's websites which state that Defendant and its

- 3 -
Class Action Complaint

suppliers are committed to responsibly and sustainably sourcing Defendant's tuna, and that Defendant has implemented audits and verification procedures to ensure compliance. *See, e.g.*, Purina, <u>Keeping the Future in Mind Today</u>, Sustainability, *available at* https://www.purina.com/about-purina/sustainability (last visited May 8, 2019); Nestle, <u>Fish and seafood</u>, Our Impact, *available at* https://www.nestle.com/csv/raw-materials/fish-seafood (last visited May 7, 2019).

14. As noted by the Ninth Circuit, "[g]iven the choice of whether to purchase dolphin safe tuna or to purchase tuna not labeled dolphin safe, American consumers overwhelmingly chose to purchase tuna that was labeled dolphin safe. As a result, foreign tuna sellers who did not adjust their fishing methods were quickly forced out of the market." *Earth Island Institute v. Hogarth*, 494 F.3d 757, 761 (9th Cir. 2007) (rejecting Government efforts to lessen restrictions on tuna fisheries in the Eastern Tropical Pacific and upholding previous finding that best evidence available indicates that tuna fishery was having significant adverse impact on dolphin stocks).

15. The importance to consumers of dolphin safety has not lessened in the ensuing 12 years since the Court's finding, as evidenced by Defendant's continued labeling of its Fancy Feast tuna products with a dolphin safe logo and represented commitment to sustainable fishing practices.

16. In the very first paragraph of its "Nestle Responsible Sourcing Standard", Defendant acknowledges the importance to consumers of sustainable sourcing practices by claiming its responsible sourcing standards "deliver[] on consumer expectations on where our products come from and how they are made." Nestle, "Nestle Responsible Sourcing Standard", at 3, *available at* https://www.nestle.com/asset-library/documents/library/documents/suppliers/nestle-responsible-sourcing-standard-english.pdf (last visited May 1, 2019).

Class Action Complaint

17.    And, Petco Animal Supplies, Inc., the second largest U.S. retailer of pet products, in answer to "what are the driving forces behind pursuing sustainability as a retailer," replied: "Pet parents really care about the environment, and our job is to provide them with products that are aligned with their values." Pet Age, "Sustainability Top Priority at Petco", *available at* https://www.petage.com/sustainability-top-priority-at-petco/ (last visited May 1, 2019) (Petco's vice president of sustainability, safety, and environmental health).

18.    Petco is not alone in its recognition of the importance to consumers of dolphin safety and the sustainable sourcing of seafood as evidenced by many retailers' refusal to sell tuna that is not caught using dolphin safe pole-and-line, trolling[2], or handline catch methods. *See, e.g.*, PetSmart, <u>Environmental Sustainability Report</u>, at 3, *available at* http://media.corporate-ir.net/media_files/irol/19/196265/2011_Sustainability_Report_PetSmart.pdf (last visited May 1, 2019) ("As a company dedicated to improving the lives of pets and Pet Parents, we are committed to being environmentally conscious by developing innovative and sustainable approaches for our unique resource needs."); Whole Foods Market, <u>Sustainable Canned Tuna</u>, *available at* https://www.wholefoodsmarket.com/sustainable-canned-tuna (last visited Apr. 17, 2019) ("Our sourcing policy requires all fisheries supplying canned tuna to use pole-and-line, troll or handline catch methods" unlike "[m]uch of conventional canned tuna [which] is caught by vessels using purse seine nets with Fish Aggregating Devices (known as FADs), that attract tuna but also result in high bycatch of … other marine life."); Whole Foods Market, <u>Canned Tuna Sourcing Policy</u>, *available at* http://assets.wholefoodsmarket.com/www/departments/seafood/Whole_Foods_Mar

---

[2] Method of fishing whereby one or more fishing lines with baits are drawn through the water.  Monterey Bay Aquarium Seafood Watch, <u>Fishing & Farming Methods</u>, *available at* https://www.seafoodwatch.org/ocean-issues/fishing-and-farming-methods (last visited May 3, 2019).

ket_Canned_Tuna_Sourcing_Policy_102017.pdf (last visited Apr. 17, 2019) ("Requirements for Source Fisheries" include "1. All canned tuna must be sourced from pole and line, troll, and handline fisheries. Tuna from longline or purse seine fisheries is prohibited."); PR Newswire, <u>Safeway Announces New Sustainable Sourcing Practice for Tuna</u>, *available at* https://www.prnewswire.com/news-releases/safeway-announces-new-sustainable-sourcing-practice-for-tuna-139096714.html (last visited Apr. 17, 2019); Albertsons/Safeway, <u>Supplier Sustainability Guidelines and Expectations</u> (Aug. 2015), at 21, *available at* https://suppliers.safeway.com/usa/pdf/supplier_sustainability_expectations.pdf (last visited Apr. 29, 2019) ("Suppliers are encouraged" to [n]ot use Purse-seine nets deployed on Fish Aggregation Devices (FADs) and employ alternatives such as pole and line trolling in an effort to reduce or eliminate by-catch"); H-E-B, <u>H-E-B seafood policy</u>, *available at* https://www.heb.com/static-page/article-template/H-E-B-Seafood-Policy (last visited Apr. 17, 2019) (for wild-caught seafood, H-E-B preferentially sources from fisheries that reduce bycatch, and H-E-B "will never knowingly buy or sell any illegal, unreported, or unregulated (IUU) fish"); Giant Eagle, <u>Giant Eagle Tuna Policy</u>, *available at* https://www.gianteagle.com/about-us/sustainable-seafood/tuna-policy (last visited Apr. 29, 2019) (encourages suppliers to "eliminate harvest with the use of non-entangling FADs"); Wegmans, <u>Seafood Sustainability</u>, *available at* https://www.wegmans.com/about-us/making-a-difference/sustainability-at-wegmans/seafood-sustainability.html (last visited Apr. 29, 2019) ("Our wild-caught seafood suppliers must meet Wegmans' high standards to source seafood that is caught responsibly" including having "[g]ear chosen to reduce bycatch.").

19.    Almost all retailers have implemented sustainable seafood sourcing policies and goals in response to customer feedback.  In addition to Petco and PetSmart and the other retailers referenced above, Kroger, for example, which

operates 2,782 retail supermarkets in 35 states and the District of Columbia and serves over 9 million customers a day, has adopted a comprehensive sustainable sourcing program in response to customer feedback received at "in-store service counters, online surveys, telephone surveys, focus groups, websites and social media" as well as its live call "Kroger Customer Connect" center.  The Kroger Family of Companies, <u>2018 Sustainability Report</u> ("Kroger Sustainability Report"), *available at* http://sustainability.kroger.com/Kroger_CSR2018.pdf (last visited Apr. 17, 2019), at 12.

20.    The special "Dolphin Safe" logo Defendant includes on each Fancy Feast tuna product as shown below is intended to convey the message 100% dolphin safe – meaning no dolphins were killed or seriously injured in capturing Defendant's Fancy Feast tuna:



21.    However, unknown to consumers, substantial numbers of dolphins and other marine life are killed and harmed by the fishermen and fishing methods used to catch Defendant's tuna.  Thus, Defendant's dolphin safe label representations are false, misleading, and/or deceptive.

**Dolphin Safety Legislation**

22.    Since the 1980s, Congress has passed a series of laws to protect dolphins and other marine life from indiscriminate fishing methods.  Beginning with the MMPA, which Congress repeatedly strengthened in 1984, 1988, and 1992, Congress "ban[ned] importation of tuna that failed to meet certain conditions regarding dolphin

mortality." *Earth Island Institute v. Evans*, No. C 03-0007-THE, ECF No. 293 at 3 (N.D. Cal.).

23. Then, in 1990, Congress passed the DPCIA, which created the dolphin safe mark. 16 U.S.C. 1385. The Act provided that tuna could only be labeled with the official "dolphin safe" mark codified at 50 CFR §216.95 if, *inter alia*, the tuna was not caught in the Eastern Tropical Pacific ("ETP") using nets intentionally deployed on or to encircle dolphins, was certified as dolphin safe by an independent observer on the tuna boat, and can be traced from the fishery, to the cannery, to the shelf. *Id.*

24. The DPCIA imposes heightened dolphin safety requirements which are not limited to ETP fisheries on manufacturers, like Defendant, who label their products with alternative dolphin safe marks. 16 U.S.C. §1385(d)(3).

25. The DPCIA-established official dolphin safe mark is codified at 50 CFR §216.95. That official mark contains the words "U.S. Department of Commerce", along with the words "Dolphin Safe" in red next to a blue-colored dolphin profile facing the upper left, and a tricolor (light blue, blue, and dark blue) banner along the bottom of the mark that overlaps with the dolphin's fluke:



26.     Defendant elected not to utilize the DPCIA official dolphin safe logo. By placing an alternative "dolphin safe" logo on Fancy Feast tuna products, rather than the official mark, Defendant voluntarily assumed the heightened dolphin safety requirements under the DPCIA applicable to all locations where Defendant captures its tuna.  Pursuant to the regulations, Defendant must ensure that (1) "no dolphins were killed or seriously injured in the sets or other gear deployments in which the tuna were caught"; and (2) "the label is supported by a tracking and verification program" throughout the fishing, transshipment and canning process, "periodic audits and spot checks" are conducted, and Defendant must provide "timely access to data required".  16 U.S.C. §§1385(d)(3)(C) and (f).

27.     To be clear, the Act and implementing regulations specify that "no" dolphin must be "killed or seriously injured" and if "a" dolphin "was killed or seriously injured [defined as 'any injury that will likely result in mortality' (50 CFR §216.3)]" the tuna is not dolphin safe and must be stored physically separate from tuna that is dolphin safe and must be supported by sufficient documentation to enable the National Marine Fisheries Service to trace the non-dolphin safe tuna back to the fishing trip.  50 CFR §216.91.

28.     Plaintiffs allege that Defendant falsely represents that Fancy Feast tuna products are "dolphin safe" – meaning "no" dolphins were killed or seriously injured – when Defendant's tuna fishing practices kill or harm substantial numbers of dolphins each year.  And because Defendant admittedly does not adequately trace or otherwise identify the tuna that is not dolphin safe and physically segregate and store it separately from any tuna that may be dolphin safe (if any), Defendant may not label any of its products as dolphin safe.

//

//

- 9 -

Class Action Complaint

**Defendant's Fishing Practices and Violation of Its
Dolphin Safe Representations**

29.    Several cat food tuna companies and companies that manufacture shelf-stable tuna products for human consumption use traditional pole-and-line and trolling methods of catching tuna.  These companies include American Tuna (for its Deck Hand Premium Cat Food and The Cat's Fish brands) and Fish4Ever (for its tuna cat food sold in the UK), which use pole-and-line to capture their tuna; Safe Catch, Ocean Naturals (for its Albacore tuna), and Wild Planet, which use pole-and-line and trolling; and American Tuna, Whole Foods 365 Everyday Value brand (for its skipjack and albacore tuna), and Trader Joe's (for its skipjack and yellowfin tuna), which exclusively use pole-and-line to capture their tuna.[3]

30.    While more costly, these traditional methods ensure that dolphins (and other bycatch) are not harmed in the fishing process because fish are caught using barbless hooks and poles one at a time near the sea's surface and unintended captured species are easily released.  Tuna caught by these methods are actually "dolphin safe".

---

[3] *See* Deck Hand Cat Food Coming Soon, *available at* https://deckhandcatfood.com/ (last visited May 7, 2019); The Cat's Fish, Home, *available at* https://thecatsfish.com/ (last visited May 7, 2019); Fish4Ever, Sustainability, http://www.fish4ever.co.uk/ (last visited May 7, 2019); Safe Catch, The Safe Catch Way, *available at* https://safecatch.com/ (last visited May 3, 2019); Ocean Naturals, Albacore, Responsibly Caught, *available at* https://oceannaturals.com/responsibly-caught/albacore-tuna/ (last visited May 3, 2019); Wild Planet, Good to the Core, Products-Tuna, *available at* https://www.wildplanetfoods.com/products/tuna/ (last visited May 3, 2019); American Tuna, American Tuna, Home, available at https://americantuna.com/ (last visited May 3, 2019); Whole Foods Market, Wild, Salt Added Tuna, 5 oz, Products>365 Everyday Value, *available at* https://products.wholefoodsmarket.com/product/365-everyday-value-wild-salt-added-tuna-10e1c0 (last visited May 3, 2019); Whole Foods Market, Albacore Wild Tuna, 5 oz, Products>365 Everyday Value, *available at* https://products.wholefoodsmarket.com/product/365-everyday-value-albacore-wild-tuna-5-oz-b83f86 (last visited May 3, 2019); Trader Joe's, About Trader Joe's Seafood, Announcements>Customer Updates (July 17, 2013), *available at* https://www.traderjoes.com/announcement/a-note-to-our-customers-about-trader-joes-seafood (last visited May 3, 2019).

31.     Defendant is not among the tuna companies that use only dolphin safe pole-and-line or trolling techniques to capture the tuna in its Fancy Feast tuna products.  Nor does Defendant identify the dolphin-harming fishing methods it does use on the Product labels or on its website, simply stating "our fish and seafood come from a variety of sources, including wild fisheries in oceans around the world…" Nestle, Fish and seafood, Our Impact, *available at* https://www.nestle.com/csv/raw-materials/fish-seafood (last visited May 7, 2019).  The unspecified "variety of sources" principally include Thai Union Group, which is based in Thailand and known for its illegal, unreported, and unregulated fishing practices,[4] and its indiscriminate use of purse seine nets and longlines to capture tuna.  Nestle, Fish and seafood, Our Impact, *available at* https://www.nestle.com/csv/raw-materials/fish-seafood (last visited May 7, 2019).  Both of these fishing methods kill and harm substantial numbers of dolphins.

32.     Longlines consist of a 40-80 mile long main line to which many smaller branch lines with baited hooks are attached to catch tuna.  Longlines are highly indiscriminate fishing gear as they attract large numbers of target and non-target fish, as well as dolphins, that get snagged on the hooks by their mouth or other body parts when they go after the bait and then remain on the line for extended periods of time as the lines are drawn in to the vessel and the catch is obtained.  The hooked fish are retrieved by mechanically pulling the main line back onto the fishing vessel, which can take 10 hours.  As dolphins are oxygen breathers, most do not survive the 10-hour retrieval process.  And any that do are often not released.

33.     Even when dolphins are mistakenly caught by these longlines, they are often not released.  Rather, the fishermen that catch these dolphins often kill them onboard and have been photographed posing with their catch, mutilating the dolphins

---

[4]     Greenpeace, "2017 Tuna Shopping Guide", *available at* https://www.greenpeace.org/usa/oceans/tuna-guide/ (last visited Apr. 17, 2019).

and removing their teeth, which can be used as currency.  Because of the harm caused to non-target fish, longlines have been condemned by environmental groups like the World Wildlife Foundation ("WWF") as an unsustainable fishing practice.  WWF, Bycatch, Threats, *available at* www.worldwildlife.org/threats/bycatch (last visited May 3, 2019).

34.    Purse seine nets also trap, kill, and harm substantial numbers of dolphins.  Because purse seine nets can reach more than 6,500 feet in length and 650 feet deep – the equivalent of 18 football fields by 2 football fields[5]– they often entrap dolphins when drawn closed, particularly because many of the purse seine fishing vessels use free floating rafts of flotsam known as fish aggregating devices, or FADs, to capture tuna.

35.    FADs are known as floating death traps because dolphins and other marine life get entangled in the devices and their sheer numbers – estimated at 30,000 to 50,000 per year – disrupt behavior and movement patterns of dolphins and other ocean species crucial to their survival.  And, as most FADs are not removed after use, they pollute the oceans in direct conflict with Defendant's proclaimed goals of "zero waste" and "a cleaner planet for future generations."  *See* Purina, Keeping the Future in Mind Today, Sustainability, *available at* https://www.purina.com/about-purina/sustainability (last visited May 7, 2019).

36.    While FADs are extremely effective at luring tuna, they also attract dolphins – particularly in the ETP where schools of tuna routinely gather beneath schools of dolphins to reduce the risk of predation.  The tuna, dolphins, and other marine life are all caught in the gigantic mile circumference purse seine nets that are deployed around the FAD to catch the tuna.

---

[5] Elizabeth Brown, Fishing Gear 101: Purse Seines – The Encirclers (June 6, 2016), *available at* http://safinacenter.org/2015/12/fishing-gear-101-purse-seines-the-encirclers/ (last visited May 3, 2019) ("Brown 2016").

- 12 -
Class Action Complaint

37.   Since the 1980s, changes in the design of nets and fishing practices that allow dolphins to escape the net have significantly reduced dolphin mortality.  Brown 2016.   Nonetheless, significant numbers of dolphins (over a thousand a year according to NOAA[6]) are still harmed by this method, as unintended bycatch can account for more than 30% of a ship's haul.  And, even though unintended bycatch may be still alive when dumped out of the nets onto the boat, by the time they are thrown back into the ocean, most are dead or near dead.

38.   Even when dolphins escape the purse seine nets or are released alive from the longlines and nets, dolphins are harmed by these fishing practices.

39.   Several studies have observed a number of indirect ways the fishery causes dolphin deaths, including: dolphin mother-calf separation as calves are dependent upon their mothers until weaned 1.5 years postpartum, and, even then, the calves do not reach full muscle maturation until age 3; acute cardiac and muscle damages caused by the exertion of avoiding or detangling from the FADs and purse seine nets; cumulative organ damage in released dolphins due to overheating from escape efforts; failed or impaired reproduction; compromised immune function; and unreported mortalities due to under-counting by purse-seine fishing vessels.  *See, e.g.*, U.S. Department of Commerce, Reilly, *et al.*, <u>Report of the Scientific Research Program Under the International Dolphin Conservation Program Act</u>, NOAA Technical Memorandum NMFS (March 2005), at 67-71, 76 *available at* https://swfsc.noaa.gov/publications/TM/SWFSC/NOAA-TM-NMFS-SWFSC-372.PDF (last visited May 3, 2019).  *See also* Wade, et al., *Depletion of spotted and spinner dolphins in the eastern tropical Pacific: modeling hypotheses for their lack of recovery*, Mar Ecog Prog Ser 343:1-14, 2007, at 11 (noting "[a] summary of recent research … clearly illustrates that the purse seine fishery has the capacity to affect

---

[6] NOAA 2016.

Class Action Complaint

dolphins beyond the direct mortality observed as bycatches"); Kellar, et al., *Pregnancy patterns of pantropical spotted dolphins (Stenella attenuata) in the eastern tropical Pacific determined from hormonal analysis of blubber biopsies and correlations with the purse-seine tuna fishery*, Mar Biol (2013) 160:3113-3124, at 3120 (tuna fishery reduces likelihood of female becoming pregnant or maintaining pregnancy).

40.  As the indirect harmful effects of Defendant's fishing practices also "likely result in [dolphin] mortality" (50 CFR §216.3), Defendant's tuna is not dolphin safe.  It is conservatively estimated that the total reported dolphin mortality is underestimated by 10-15% for spotted dolphins and 6-10% for spinner dolphins given these indirect harmful effects and unobserved and underreported kills.  Reilly, *et al.*, 2005, at 7.

41.  Because the use of FADs, purse seine nets, and longlines are unsustainable fishing practices, several companies that supply the U.S. tuna market will not source their tuna from boats that use these indiscriminate fishing methods. But Defendant is not among these companies.

### Defendant Does Not Track and Report the Numbers of Dolphins Killed or Maimed in Capturing Its Tuna

42.  Defendant's use of an alternative dolphin safe logo on its Fancy Feast tuna products requires it to track, audit, and spot check for accuracy that "no dolphins were killed or seriously injured in the sets or other gear deployments in which the tuna were caught" from capture, to transshipment[7], to cannery, to shelf.  And, in the event even a single dolphin is "killed or seriously injured" during the catch,

---

[7] Transfer of a shipment from one carrier, or more commonly, from one vessel to another whereas in transit. Transshipments are usually made (1) where there is no direct air, land, or sea link between the consignor's and consignee's countries, (2) where the intended port of entry is blocked, or (3) to hide the identity of the port or country of origin.  "Business Dictionary – transshipment", *available at* http://www.businessdictionary.com/definition/transshipment.html\ (last visited Apr. 30, 2019).

Class Action Complaint

Defendant must physically separate and store that catch from any tuna catches in which no dolphins were harmed (if any) and maintain records tracing the catch(es) in which dolphins were harmed back to the fishing vessel and trip.  50 CFR §216.91.

43.    Unlike fisheries in the ETP, boats in the other oceanic regions that supply Defendant's tuna are not required to have independent observers onboard to track and report the number of dolphins killed or seriously injured.  16 U.S.C. § 1385(d)(1).   A declaration from the ship's captain that no purse seines were intentionally set on dolphins suffices.  16 U.S.C. §1385(d)(1)(B).  These declarations are limited to certifying that "no purse seine net was intentionally deployed on or used to encircle dolphins during the particular voyage on which the tuna was harvested" and do not require certification that FADs, gillnets, longlines and other dolphin harming fishing techniques were not used.  Nor must the captain quantify the number of dolphins killed or otherwise harmed.  There is a strong financial incentive for a captain to falsely certify a catch is "dolphin safe," as any catch that is not "dolphin safe" is essentially worthless.  And, it is relatively simple to do so as the majority of certifications are paper-based and typically filled in by hand – often after the vessel has returned to port – making it virtually impossible to adequately verify these certifications.

44.    Instead, Defendant is solely responsible for collecting information about the number of dolphins killed or seriously injured, which Defendant fails to do. Defendant does not track, trace, and report the number of dolphins killed or harmed by Defendant's tuna fishing vessels and acknowledges that "identifying the precise sources for fish and seafood is difficult. For pet food, which primarily uses fish by-products, traceability is even more challenging as the typical traceability mechanisms for whole fish do not suffice."  Nestle, Fish and seafood, Our Impact, *available at*

Class Action Complaint

https://www.nestle.com/csv/raw-materials/fish-seafood (last visited May 7, 2019).[8] Consistent with its admission that it does not track, audit, and spot check for accuracy its dolphin safe representation, Defendant does not answer the query on its own website "[w]here do our dog and cat food ingredients come from" as it pertains to the tuna in its Fancy Feast tuna products.  Purina, <u>Where do our dog and cat food ingredients come from?</u>, *available at* https://www.purina.com/nutrition/nutrition-articles/where-do-our-pet-food-ingredients-come-from (last visited May 7, 2019).

45.    By purchasing its tuna from fishing vessels that use purse seine nets deployed around FADs and/or longlines, Defendant is able to reduce its product costs and more effectively compete with other tuna companies for a bigger share of the cat food market.

## **<u>Defendant's Sustainable Fishing Practices Misrepresentations</u>**

46.    Defendant's commitment to sustainable fishing practices, including dolphin safe sourcing, is the common message in its widespread and long-term advertising campaign.  In the preamble of its Responsible Sourcing Standard, Defendant states: "Nestle's approach to Responsible Sourcing is a fundamental pillar of our purpose, enhancing quality of life and contributing to a healthier future." … "It delivers on consumers['] expectations on where our products come from and how they are made."  Nestle, <u>Nestle Responsible Sourcing Standard</u> (July 2018), at 3, *available* *at* https://www.nestle.com/asset-

---

[8] Traceability is possible as evidenced by, among other facts, American Tuna's statement that its Cat's Fish premium canned tuna "is sustainable, traceable, 3rd party audited, tested safe and labeled with the name of the fishery" and the links provided on its website introducing consumers to the fishermen who caught the tuna with photos using pole and lines go catch the tuna.  The Cat's Fish, <u>Home</u>, *available at* https://thecatsfish.com/ (last visited May 7, 2019); The Cat's Fish, <u>About</u>, *available at* https://thecatsfish.com/about/ (last visited May 7, 2019).  American Tuna's Deck Hand premium cat food wild caught tuna is similarly traceable to the specific catch.  Lucy Towers, <u>Sustainable Pole & Line Tuna and Deck Hand Premium Cat Food Launched</u>, The Fish Site (May 27, 2014), *available at* https://thefishsite.com/articles/sustainable-pole-line-tuna-and-deck-hand-premium-cat-food-launched (last visited May 7, 2019).

library/documents/library/documents/suppliers/nestle-responsible-sourcing-standard-english.pdf (last visited May 7, 2019).

47.    Recognizing that "Fish and Seafood are precious resources for our planet and all who live on it", Defendant claims it "work[s] hard to ensure our fish and seafood come from responsible sources…"  Nestle, Fish and seafood, Our Impact, *available at*   https://www.nestle.com/csv/raw-materials/fish-seafood (last visited May 7, 2019).

48.    Defendant's self-proclaimed "innovative solutions" (*id.*) are set forth in its July 2018 Nestle Responsible Sourcing Standard.  Notably absent from its Responsible Sourcing Standard is the banning or effective control of FADs, longlines, or other unsustainable fishing techniques.  Nestle Responsible Sourcing Standard (July 2018), at 22.  Only "bottom trawling or dredging fishing methods, dynamite, cyanide, muro-ami or high seas drift nets" are identified as banned practices. *Id.*  And, even as to these "highly destructive" fishing methods, Defendant allows its suppliers 3 years to phase them out upon discovery and relies upon its suppliers to self-report standards violations, which they are unlikely to do. *Id.* at 4, 23.

49.    Defendant also does not set any limits or restrictions on bycatch, other than prohibiting the capture of endangered, threatened, and protected species as identified in the International Union for Conservation of Nature's Red List. *Id.* at 22. Of the 38 species of oceanic dolphins, only 4 are included on the Red List as endangered or critically endangered and they are generally not found in the areas Defendant sources its tuna.  IUCN Red List, Irrawaddy Dolphin, *available at* https://www.iucnredlist.org/species/15419/123790805 (last visited May 7, 2019); IUCN    Red    List,    Hector's    Dolphin,    *available    at* https://www.iucnredlist.org/species/4162/44199757 (last visited May 7, 2019); IUCN    Red    List,    Indian    Ocean    Humpback    Dolphin,    *available    at*

https://www.iucnredlist.org/species/82031633/82031644 (last visited May 7, 2019); IUCN Red List, <u>Atlantic Humpback Dolphin</u>, *available at* https://www.iucnredlist.org/species/20425/123792572 (last visited May 7, 2019).

50.     There is no evidence that Defendant will act any time soon to halt its destructive and dolphin-harming fishing practices, notwithstanding its membership in the Sustainable Fisheries Partnership ("SFP"), whose "ambition has always been to see that 100% of seafood worldwide is produced sustainably" through "industry-driven change".     Sustainable Fisheries Partnership, <u>Home</u>, *available at* https://www.sustainablefish.org/ (last visited May 7, 2019).   According to SFP, "[t]his is obviously a distant and aspirational goal, likely many decades away into the future…"[9], of which Defendant's tuna fishing practices confirm.

51.     Because Defendant uses longlines, FADs, and other well-known dolphin-harming fishing techniques, notwithstanding its Responsible Sourcing Standards, Defendant's sustainability representations are false, misleading, and/or deceptive.

**<u>Defendant, Unlike Other Tuna Companies, Does Not Use<br>Dolphin Safe Tuna Fishing Methods</u>**

52.     Unlike several other tuna companies who sell to the U.S. market, Defendant has not mandated dolphin safe fishing practices in the supply chain for its Fancy Feast tuna products, such as pole-and-line, trolling, and/or handline catch methods, whereby fishermen catch one fish at a time and release unwanted species soon after a fish takes the bait.

53.     Most U.S. retailers have sustainability guidelines and expectations of their seafood suppliers that include: using recognized dolphin safe tuna capture methods, having programs in place to trace the tuna back to the boat and place of capture, and guaranteeing the catch method used.   *See, e.g.*, Whole Foods Market,

---

[9]     Sustainable Fisheries Partnership, <u>Target 75</u>, *available at* https://www.sustainablefish.org/Programs/Target-75 (last visited May 7, 2019).

Sustainable                    Canned                    Tuna,        *available            at*
https://www.wholefoodsmarket.com/sustainable-canned-tuna (last visited Apr. 17, 2019) ("Our sourcing policy requires all fisheries supplying canned tuna to use pole-and-line, troll or handline catch methods" unlike "[m]uch of conventional canned tuna [which] is caught by vessels using purse seine nets with Fish Aggregating Devices (known as FADs), that attract tuna but also result in high bycatch of … other marine life."); Whole Foods Market, Canned Tuna Sourcing Policy (Aug. 15, 2018), *available                                                                                                  at* http://assets.wholefoodsmarket.com/www/departments/seafood/Whole_Foods_Market_Canned_Tuna_Sourcing_Policy_102017.pdf (last visited Apr. 17, 2019) ("Requirements for Source Fisheries" include "1. All canned tuna must be sourced from pole and line, troll, and handline fisheries. Tuna from longline or purse seine fisheries is prohibited."); PR Newswire, Safeway Announces New Sustainable Sourcing     Practice     for     Tuna     (February     10,     2012),     *available     at* https://www.prnewswire.com/news-releases/safeway-announces-new-sustainable-sourcing-practice-for-tuna-139096714.html     (last     visited     Apr.     17,     2019); Albertsons/Safeway, Supplier Sustainability Guidelines and Expectations (August 2015),                at                21,                *available                at* https://suppliers.safeway.com/usa/pdf/supplier_sustainability_expectations.pdf (last visited Apr. 29, 2019) ("Suppliers are encouraged" to "[n]ot use Purse-seine nets deployed on Fish Aggregation Devices (FADs) and employ alternatives such as pole and line trolling in an effort to reduce or eliminate by-catch"); H-E-B, H-E-B seafood policy, *available at* https://www.heb.com/static-page/article-template/H-E-B-Seafood-Policy (last visited Apr. 17, 2019) (for wild-caught seafood, H-E-B preferentially sources from fisheries that reduce bycatch, and H-E-B "will never knowingly buy or sell any illegal, unreported, or unregulated (IUU) fish"); Giant Eagle, Tuna Policy, *available at* https://www.gianteagle.com/about-us/sustainable-

Class Action Complaint

seafood/tuna-policy (last visited Apr. 29, 2019) (encourages suppliers to "eliminate harvest with the use of non-entangling FADs"); Wegmans, Seafood Sustainability, *available at* https://www.wegmans.com/about-us/making-a-difference/sustainability-at-wegmans/seafood-sustainability.html (last visited Apr. 29, 2019) ("Our wild-caught seafood suppliers must meet Wegmans' high standards to source seafood that is caught responsibly" including having "[g]ear chosen to reduce bycatch."); Sprouts, Sustainable Seafood Policy, *available at* https://about.sprouts.com/product-sourcing/sustainable-seafood-policy/ (last visited Apr. 17, 2019); Publix, Publix Sustainability Report 2019, *available at* https://sustainability.publix.com/wp-content/uploads/sustainability-report.pdf (last visited Apr. 17, 2019) (supplier commitment to sustainable fishing "helps us decide whether to sell a product, enhance fisheries through improvement projects or halt the sale of a product until the issue is resolved.").

54.     Pet stores also have sustainability guidelines and expectations of their pet food suppliers, including both PetSmart and Petco – the two largest pet product retailers in the U.S. with close to 3,000 retail outlets combined.  Petco, Code of Ethics and Conduct (2018), *available at* https://s7d1.scene7.com/is/content/PETCO/public/sourcelib/copy/about/about-petco/code-of-ethics-2018.pdf (last visited May 8, 2019) (memorializing Petco's commitment to sustainability and setting forth standards to preserve the environment); PetSmart, Environmental Sustainability Report, *available at* http://media.corporate-ir.net/media_files/irol/19/196265/2011_Sustainability_Report_PetSmart.pdf (last visited May 1, 2019) (same).  The importance of sustainability throughout the pet industry is evidenced by the formation of the Pet Sustainability Coalition in 2013, which counts both PetSmart and Petco among its approximately 100 vendor members working collectively to accelerate sustainability in the pet industry.  Tuna companies

1  who do not use sustainable and dolphin safe catch methods and do not adhere to

2  traceability requirements can expect retailers to refuse to sell their products.

3      55.     By expressing a commitment to sustainability and labeling its Fancy

4  Feast tuna products as dolphin safe, Defendant is able to sell its Fancy Feast tuna

5  products in several major retail stores to which it otherwise would be denied entry.

6  **Defendant's Dolphin Safe Sustainability Representations are**
   **False, Misleading, and/or Deceptive**

7      56.     Because dolphins are killed and harmed by the fishing methods used to

8  catch the tuna in Defendant's Fancy Feast tuna products; Defendant does not

9  adequately track, verify, audit, and spot check the number of dolphins killed and

10 harmed; and Defendant does not separately store the tuna that is not dolphin safe,

11 Defendant's use of the alternative dolphin safe logo, its dolphin safe representations,

12 and its sustainability representations are false, misleading, and/or deceptive.

13     57.     Reasonable consumers rightly believe that "dolphin safe" means "no"

14 dolphins were harmed in the process of catching the tuna in Defendant's Fancy Feast

15 tuna products.  That is precisely the regulatory definition of dolphin safe.  50 CFR

16 §§216.3, 216.91.  And it is the message that Defendant has consistently conveyed to

17 the public in its widespread and long-term advertising and marketing campaign.

18     58.     Dolphin safety matters to consumers and it materially affects their

19 decision whether to purchase Fancy Feast tuna.  So too does the use of sustainable

20 fishing practices that, among other things, minimize the amount of unwanted

21 bycatch.  If consumers knew Defendant's Fancy Feast tuna products were not dolphin

22 safe and/or not caught using sustainable fishing methods they would not buy

23 Defendant's Fancy Feast tuna products, particularly because there are several

24 competing brands of like tuna products that are dolphin safe and sustainably sourced.

25 Thus, Plaintiffs and Class members are entitled to a full refund.

26     59.     Any nutrient value notwithstanding, because Defendant's false dolphin

27

28

safe representations and/or unsustainable catch methods taint the entire purchase – from whether Fancy Feast tuna that is not dolphin safe and/or not sustainably caught would even be sold by retailers to whether consumers would purchase Fancy Feast tuna that was not dolphin safe and/or sustainably caught if available for purchase – consumers, like Plaintiffs here, are entitled to a full refund.   The importance consumers place upon dolphin safety and their abject distaste for indiscriminate and destructive fishing methods makes tuna pet food consumers no different from Hindus attributing zero value to beef products, or vegans attributing zero value to animal products, or vegetarians attributing zero value to meat, fish, and poultry, no matter what nutritive value these products may otherwise have. Further, if the retailers of Defendant's Fancy Feast tuna products knew they were not sustainably sourced and dolphin safe, they would refuse to sell Defendant's Fancy Feast tuna products.  This too entitles Plaintiffs and Class members to a full refund.

60.    Alternatively, Plaintiffs and Class members are entitled to the premium attributable to the dolphin safe and sustainable fishing practices misrepresentations.

61.    Plaintiffs bring this action on behalf of themselves and other similarly situated consumers who purchased the Fancy Feast tuna products to halt the dissemination of this false, misleading and deceptive advertising message, correct the misleading perception it has created in the minds of consumers, and obtain redress for those who have purchased the Fancy Feast tuna products. Based on Defendant's unjust enrichment and violations of California and New York unfair competition laws (detailed below), Plaintiffs seek damages, declaratory, injunctive, and restitutionary relief for consumers who purchased the Fancy Feast tuna products.

## JURISDICTION AND VENUE

62.    This Court has original jurisdiction pursuant to 28 U.S.C. §1332(d)(2). The matter in controversy, exclusive of interest and costs, exceeds the sum or value of $5,000,000 and is a class action in which there are in excess of 100 class members

1  and some members of the Class are citizens of a state different from Defendant.

2      63.   This Court has personal jurisdiction over Defendant because Defendant

3  is authorized to conduct and do business in California, including this District.

4  Defendant marketed, promoted, distributed, and sold the Fancy Feast tuna products

5  in California, and Defendant has sufficient minimum contacts with this State and/or

6  sufficiently availed itself of the markets in this State through its promotion, sales,

7  distribution, and marketing within this State, including this District, to render the

8  exercise of jurisdiction by this Court permissible.

9      64.   Venue is proper in this Court pursuant to 28 U.S.C. §§1391(a) and (b)

10  because a substantial part of the events giving rise to Plaintiff Myers' claims occurred

11  while she resided in this judicial district.  Venue is also proper under 18 U.S.C. §

12  1965(a) because Defendant transacts substantial business in this District.

13                                   **PARTIES**

14      65.   Plaintiff Lori Myers resides in Moreno Valley, California and is a citizen

15  of California.  Throughout the relevant period, Plaintiff Myers routinely was exposed

16  to, saw, and relied upon Defendant's dolphin safe representations by viewing the

17  dolphin safe mark on the Fancy Feast Classic Pate Ocean Whitefish & Tuna product.

18  Plaintiff Myers purchased the tuna product at a PetSmart near her and online through

19  Instacart and Amazon.  Plaintiff Myers purchased the tuna products many times

20  throughout the relevant period.  At all relevant times, Plaintiff Myers was unaware

21  that the tuna was not dolphin safe as represented and was caught using fishing

22  methods that are harmful to dolphins.  Had Plaintiff Myers known the tuna was not

23  dolphin safe and/or had Defendant not represented that the tuna was dolphin safe,

24  Plaintiff Myers would not have purchased the Nestle tuna products.  As a result,

25  Plaintiff Myers suffered injury in fact and lost money at the time of purchase.

26  Plaintiff Myers continues to desire to purchase Nestle tuna products that contain

27  dolphin safe tuna caught using fishing methods that do not harm dolphins, and she

28  - 23 -<br>Class Action Complaint

would purchase such a product manufactured by Defendant if it were possible to determine prior to purchase whether no dolphins were harmed in capturing the tuna in the product. Indeed, Plaintiff Myers regularly purchases online and visits stores such as PetSmart, where Defendant's tuna products are sold, but will be unable to rely upon the dolphin safe representations and will not be able to determine if the tuna in the products is dolphin safe and was caught using fishing methods that do not harm dolphins when deciding whether to purchase the tuna products in the future.

66.     Plaintiff Alison Cullen resides in Port Washington, New York, and is a citizen of New York.  Throughout the relevant period, Plaintiff Cullen routinely was exposed to, saw, and relied upon Defendant's dolphin safe representations by viewing the dolphin safe mark on Defendant's Fancy Feast Classic Pate Ocean Whitefish & Tuna, Wet Cat Food Complement Classic Tuna & Vegetable Broths, Gravy Lovers Ocean Whitefish & Tuna in Sautéed Seafood Flavor Gravy, and Delights with Cheddar Grilled Tuna & Cheddar Cheese in Gravy products at various retailers, including Target in Port Washington, New York, Pet Supplies Plus in Manhasset, New York, and online at Chewy.com.  Plaintiff Cullen purchased the Fancy Feast tuna product on multiple occasions throughout the relevant period.  At all relevant times, Plaintiff Cullen was unaware that the Fancy Feast tuna product was not dolphin safe as represented and was caught using fishing methods that are harmful to dolphins.  Had Plaintiff Cullen known the Fancy Feast tuna product was not dolphin safe and/or had Defendant not represented that the tuna product was dolphin safe, Plaintiff Cullen would not have purchased the Fancy Feast tuna product.  As a result, Plaintiff Cullen suffered injury in fact and lost money at the time of purchase.  Plaintiff Cullen continues to desire to purchase tuna products that contain dolphin safe tuna caught using fishing methods that do not harm dolphins, and she would purchase such a product manufactured by Defendant if it were possible to determine prior to purchase whether no dolphins were harmed in capturing the tuna

in the product. Indeed, Plaintiff Cullen regularly visits stores such as Target and Pet Supplies Plus, where Defendant's Fancy Feast tuna products are sold, but will be unable to rely upon the dolphin safe representations and will not be able to determine if the tuna in the products is dolphin safe and was caught using fishing methods that do not harm dolphins when deciding whether to purchase the Fancy Feast tuna products in the future.

67. Plaintiff Alexander Mouganis resides in Port Washington, New York, and is a citizen of New York. Throughout the relevant period, Plaintiff Mouganis routinely was exposed to, saw, and relied upon Defendant's dolphin safe representations by viewing the dolphin safe mark on Defendant's Fancy Feast Classic Pate Ocean Whitefish & Tuna, Wet Cat Food Complement Classic Tuna & Vegetable Broths, Gravy Lovers Ocean Whitefish & Tuna in Sautéed Seafood Flavor Gravy, and Delights with Cheddar Grilled Tuna & Cheddar Cheese in Gravy products at various retailers, including Target in Port Washington, New York, Pet Supplies Plus in Manhasset, New York, and online at Chewy.com. Plaintiff Mouganis purchased the Fancy Feast tuna product on multiple occasions throughout the relevant period. At all relevant times, Plaintiff Mouganis was unaware that the Fancy Feast tuna product was not dolphin safe as represented and was caught using fishing methods that are harmful to dolphins. Had Plaintiff Mouganis known the Fancy Feast tuna product was not dolphin safe and/or had Defendant not represented that the tuna product was dolphin safe, Plaintiff Mouganis would not have purchased the Fancy Feast tuna product. As a result, Plaintiff Mouganis suffered injury in fact and lost money at the time of purchase. Plaintiff Mouganis continues to desire to purchase tuna products that contain dolphin safe tuna caught using fishing methods that do not harm dolphins, and she would purchase such a product manufactured by Defendant if it were possible to determine prior to purchase whether no dolphins were harmed in capturing the tuna in the product. Indeed, Plaintiff Mouganis regularly visits stores

such as Target and Pet Supplies Plus, where Defendant's Fancy Feast tuna products are sold, but will be unable to rely upon the dolphin safe representations and will not be able to determine if the tuna in the products is dolphin safe and was caught using fishing methods that do not harm dolphins when deciding whether to purchase the Fancy Feast tuna products in the future.

68.    Defendant Nestle Purina PetCare Company is a Missouri company with its headquarters and principal place of business located at 1 Checkerboard Square, St. Louis, MO 63164, and is a citizen of Missouri.  During the time period relevant to Plaintiffs' claims, Defendant: produced and sold tuna products throughout the United States and its territories; sold Fancy Feast tuna products to Plaintiffs and others in the United States; and engaged in the false, misleading, and deceptive advertising alleged in this Complaint.

## CLASS DEFINITION AND ALLEGATIONS

69.    Plaintiffs bring this action on behalf of themselves and all other similarly situated consumers pursuant to Rules 23(a), (b)(2), (b)(3), and (c)(4) of the Federal Rules of Civil Procedure, and seek certification of the following Class:

**Nationwide Class**
All consumers who, within the applicable statute of limitations period until the date notice is disseminated, purchased the Fancy Feast tuna products in the United States.

Excluded from this Class are Defendant and its officers, directors, employees and those who purchased the Fancy Feast tuna products for the purpose of resale.

70.    In addition, Plaintiff Myers seeks certification of the following California-Only Class:

**California-Only Class**
All California consumers who within the applicable statute of limitations period until the date notice is disseminated, purchased the Fancy Feast tuna products.

> Excluded from this Class are Defendant and its officers, directors and employees, and those who purchased the Fancy Feast tuna products for the purpose of resale.

71.    In addition, Plaintiffs Cullen and Mouganis seek certification of the following New York-Only Class:

> **New York-Only Class**
> All New York consumers who within the applicable statute of limitations period until the date notice is disseminated, purchased the Fancy Feast tuna products.
>
> Excluded from this Class are Defendant and its officers, directors and employees, and those who purchased the Fancy Feast tuna products for the purpose of resale.

72.    **Numerosity**.  The members of the Classes are so numerous that their joinder is impracticable.  Plaintiffs are informed and believe that the proposed Classes contain thousands of purchasers of the Fancy Feast tuna products who have been damaged by Defendant's conduct as alleged herein.  The precise number of Class members is unknown to Plaintiffs.

73.    **Existence and Predominance of Common Questions of Law and Fact**.  This action involves common questions of law and fact, which predominate over any questions affecting individual Class members.  These common legal and factual questions include, but are not limited to, the following:

(a)    whether Defendant's dolphin safe representations and sustainable fishing practices representations are false, misleading, and/or objectively reasonably likely to deceive;

(b)    whether Defendant failed to comply with storage, traceability and verification requirements;

(c)    whether Defendant engaged in fishing practices that harmed dolphins;

(d)    whether Defendant's alleged conduct is unlawful;

(e)    whether the alleged conduct constitutes violations of the laws asserted;

(f)     whether Defendant engaged in false, misleading and/or deceptive advertising; and

(g)     whether Plaintiffs and Class members are entitled to appropriate remedies, including damages, restitution, corrective advertising, and injunctive relief.

74.     **Typicality.**  Plaintiffs' claims are typical of the claims of the members of the Classes because, *inter alia*, all Class members were injured through the uniform misconduct described above.  Plaintiffs are also advancing the same claims and legal theories on behalf of themselves and all Class members.

75.     **Adequacy of Representation.**  Plaintiffs will fairly and adequately protect the interests of Class members.  Plaintiffs have retained counsel experienced in complex consumer class action litigation, and Plaintiffs intend to prosecute this action vigorously.  Plaintiffs have no adverse or antagonistic interests to those of the Classes.

76.     **Superiority.**  A class action is superior to all other available means for the fair and efficient adjudication of this controversy.  The damages or other financial detriment suffered by individual Class members is relatively small compared to the burden and expense that would be entailed by individual litigation of their claims against Defendant.  It would thus be virtually impossible for members of the Classes, on an individual basis, to obtain effective redress for the wrongs done to them.  Furthermore, even if Class members could afford such individualized litigation, the court system could not.  Individualized litigation would create the danger of inconsistent or contradictory judgments arising from the same set of facts.  Individualized litigation would also increase the delay and expense to all parties and the court system from the issues raised by this action.  By contrast, the class action device provides the benefits of adjudication of these issues in a single proceeding, economies of scale, and comprehensive supervision by a single court, and presents no unusual management difficulties under the circumstances here.

77.     Plaintiffs seek preliminary and permanent injunctive and equitable relief on behalf of the entire Classes, on grounds generally applicable to the entire Classes, to enjoin and prevent Defendant from engaging in the acts described and requiring Defendant to provide full restitution to Plaintiff and Class members.

78.     Unless a Class is certified, Defendant will retain monies received as a result of its conduct that were taken from Plaintiffs and Class members.

79.     Unless an injunction is issued, Defendant will continue to commit the violations alleged, and the members of the Classes and the general public will continue to be deceived and not know whether the dolphin safe representations and/or sustainable fishing methods representations are true or if the Fancy Feast tuna products continue to contain tuna caught using fishing methods that are harmful to dolphins.

80.     Likewise, particular issues under Rule 23(c)(4) are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein.  Such particular issues include, but are not limited to: (a) whether Defendant marketed and sold its Fancy Feast tuna products as "Dolphin Safe" when they were not; (b) whether Defendant's conduct was unlawful, unfair, or fraudulent in violation of state consumer protections law; (c) whether Defendant's misrepresentations would deceive a reasonable consumer; (d) whether Defendant has been unjustly enriched; (e) whether Defendant failed to comply with federal law in branding its Fancy Feast tuna products "Dolphin Safe"; and (f) whether Defendant's misrepresentations regarding its tuna products would be material to a reasonable consumer.

**COUNT I –**
**Violation of California Business & Professions Code §§17200, *et seq.***
**(On Behalf of the California-Only Class)**

81.     Plaintiff Myers repeats and re-alleges the allegations contained in the

Class Action Complaint

1   paragraphs above, as if fully set forth herein.

2       82.   Plaintiff Myers brings this claim individually and on behalf of the

3   California-Only Class.

4       83.   The Unfair Competition Law, Business & Professions Code §17200, *et*

5   *seq*. ("UCL") prohibits any "unlawful," "fraudulent," or "unfair" business act or

6   practice and any false or misleading advertising.   More specifically, the UCL

7   provides, in pertinent part: "Unfair competition shall mean and include unlawful,

8   unfair, or fraudulent business act or practice and unfair, deceptive, untrue or

9   misleading advertising . . .."

10      84.   **Unlawful Business Practices:** In the course of conducting business,

11  Defendant committed "unlawful" business practices in violation of the UCL by, *inter*

12  *alia*, making the dolphin safe representations and sustainable fishing methods

13  representations, which are false, misleading, and/or deceptive (which also constitute

14  advertising within the meaning of §§17200); failing to comply with storage,

15  traceability, and verification requirements, as set forth more fully herein; violating

16  California Civil Code §§1572, 1573, 1709, and 1711; the California Legal Remedies

17  Act, California Civil Code §§1750, *et seq.*; California Business & Professions Code

18  §§17200, *et seq.* and 17500, *et seq.*; and 16 U.S.C. §1385.

19      85.   Plaintiff Myers reserves the right to allege other violations of law, which

20  constitute other unlawful business acts or practices. Such conduct is ongoing and

21  continues to this date.

22      86.   **Unfair Business Practices:** In the course of conducting business,

23  Defendant committed "unfair" business acts or practices by, *inter alia*, making the

24  dolphin safe representations and sustainable fishing methods representations which

25  are false, misleading, and/or deceptive (which also constitute advertising within the

26  meaning of §17200), and failing to comply with storage, traceability, and verification

27  requirements, as set forth more fully herein.   There is no societal benefit from false

28  - 30 -
Class Action Complaint

advertising, only harm. While Plaintiff Myers and the public at large were and continue to be harmed, Defendant has been unjustly enriched by its false, misleading, and/or deceptive representations as it unfairly enticed Plaintiff Myers and California-Only Class members to purchase its Fancy Feast tuna products instead of similar tuna products sold by other manufacturers that were dolphin safe, sustainably caught, stored separately from any non-dolphin safe tuna, traceable, and verified.  Because the utility of Defendant's conduct (zero) is outweighed by the gravity of harm to Plaintiffs, consumers, and the competitive market, Defendant's conduct is "unfair" having offended an established public policy embodied in, among other things, 16 U.S.C. §1385, where Congress expressly found that it is the policy of the United States to protect dolphin populations and that "consumers would like to know if the tuna they purchase is falsely labeled as to the effect of the harvesting of the tuna on dolphins."  16 U.S.C. §§1385(b)(2)-(3).

87.     Defendant also engaged in immoral, unethical, oppressive, and unscrupulous activities that are substantially injurious to the public at large.

88.     There were reasonably available alternatives to further Defendant's legitimate business interests, other than the conduct described herein.

89.     **<u>Fraudulent Business Practices:</u>**  In the course of conducting business, Defendant committed "fraudulent business act[s] or practices" and deceptive or misleading advertising by, *inter alia*, making the dolphin safe representations and sustainable fishing methods representations, which are false, misleading, and/or deceptive to reasonable consumers, and by failing to comply with storage, traceability, and verification requirements, regarding the Products as set forth more fully herein.

90.     Defendant's actions, claims, and misleading statements, as more fully set forth above, are misleading and/or likely to deceive the consuming public within the meaning of Business & Professions Code §§17200, *et seq.*

Class Action Complaint

91.    Plaintiff Myers relied on Defendant's dolphin safe representations and compliance with traceability and verification requirements and were in fact injured as a result of those false, misleading, and deceptive representations and by Defendant's failure to comply with storage, traceability, and verification requirements.

92.    As alleged herein, Plaintiff Myers has suffered injury in fact and lost money or property at the time of purchase as a result of Defendant's conduct because she was exposed to and purchased Defendant's Fancy Feast tuna products in reliance on the dolphin safe representations and sustainable fishing methods representations, and Defendant's compliance with storage, tracking, and verification requirements, but did not receive Fancy Feast tuna products that contain tuna caught using fishing methods that do not harm dolphins.

93.    Unless restrained and enjoined, Defendant will continue to engage in the above described conduct. Accordingly, injunctive relief is appropriate.

94.    Plaintiff Myers, on behalf of herself, all others similarly situated, and the general public, seek declaratory relief and an injunction prohibiting Defendant from continuing such practices, corrective advertising, restitution of all money obtained from Plaintiff Myers and California-Only Class members collected as a result of unfair competition, and all other relief this Court deems appropriate, consistent with Business & Professions Code §17203.

**COUNT II**
**Violations of the Consumers Legal Remedies Act – Cal. Civ. Code §§ 1750, *et seq.***
**(On Behalf of the California-Only Class)**

95.    Plaintiff Myers repeats and incorporates by reference the allegations contained in the paragraphs 1 through 80 above as if fully set forth herein.

96.    Plaintiff Myers brings this claim individually and on behalf of the California-Only Class.

- 32 -
Class Action Complaint

97.   This cause of action is brought pursuant to the Consumers Legal Remedies Act, California Civil Code §§1750, *et seq*. (the "CLRA").

98.   Plaintiff Myers is a consumer as defined by California Civil Code §1761(d). The Fancy Feast tuna products are "goods" within the meaning of the CLRA.

99.   Defendant violated and continues to violate the CLRA by engaging in the following practices proscribed by California Civil Code §1770(a) in transactions with Plaintiff Myers and the California-Only Class which were intended to result in, and did result in, the sale of the Products:

(5)  Representing that [the Products have] . . . characteristics, . . . uses [and] benefits . . . which [they do] not have . . . .

\*     \*       \*

(7)  Representing that [the Products] are of a particular standard, quality, or grade … if they are of another.

100.   Pursuant to California Civil Code §1782(d), Plaintiff Myers and the California-Only Class seek a Court Order declaring Defendant to be in violation of the CLRA, enjoining the above-described wrongful acts and practices of Defendant, and ordering restitution and disgorgement.

101.   Pursuant to §1782 of the CLRA, Plaintiff Myers notified Defendant in writing by certified mail of the particular violations of §1770 of the CLRA and demanded that Defendant rectify the problems associated with the actions detailed above and give notice to all affected consumers of Defendant's intent to so act.  A copy of the letter is attached hereto as Exhibit A.

102.   If Defendant fails to rectify or agree to rectify the problems associated with the actions detailed above and give notice to all affected consumers within 30 days of the date of written notice pursuant to §1782 of the CLRA, Plaintiff Myers will amend this Complaint to add claims for actual, punitive, and statutory damages

as appropriate.

103.   Pursuant to §1780 (d) of the CLRA, attached hereto as Exhibit B is the affidavit showing that this action has been commenced in the proper forum.

**COUNT III-**
**Violations of the New York General Business Law §349**
**(On Behalf of the New York-Only Class)**

104.   Plaintiffs Cullen and Mouganis (the "New York Plaintiffs") repeat and incorporate by reference the allegations contained in the paragraphs 1 through 80 above as if fully set forth herein.

105.   The New York Plaintiffs bring this claim individually and on behalf of the New York-Only Class.

106.   Defendant's actions alleged herein constitute unlawful, unfair, and deceptive business practices.  Those actions include misrepresenting that the tuna products are "Dolphin Safe" when they are not.

107.   Defendant's conduct constitutes acts, uses and/or employment by Defendant or its agents or employees of deception, fraud, unconscionable and unfair commercial practices, false pretenses, false promises, misrepresentations and/or the knowing concealment, suppression, or omission of material facts with the intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of goods in violation of §349 of New York's General Business Law.

108.   Defendant's deceptive conduct was generally directed at the consuming public.

109.   Defendant's unfair and deceptive trade acts and practices in violation of §349 of New York's General Business Law have directly, foreseeably, and proximately caused damages and injury to the New York Plaintiffs and other members of the New York-Only Class.

110.   Defendant's deceptive conduct has caused harm to New York-Only

Class members in that they purchased the tuna products when they otherwise would not have absent Defendant's deceptive conduct.

111.   Defendant's violations of §349 of New York's General Business Law threaten additional injury to the New York-Only Class members if the violations continue.

112.   The New York Plaintiffs, on their own behalf and on behalf of the New York-Only Class, seek damages, injunctive relief, including an order enjoining Defendant's §349 violations alleged herein, and court costs and attorneys' fees, pursuant to NY Gen. Bus. Law §349.

**COUNT IV**
**Unjust Enrichment/Quasi-Contract**
**(On Behalf of the Nationwide Class)**

113.   Plaintiffs repeat and re-allege the allegations contained in paragraphs 1 through 80 above, as if fully set forth herein.

114.   Plaintiffs and Class members conferred a benefit on Defendant by purchasing the Fancy Feast tuna products.

115.   Defendant appreciated and/or realized the benefits in the amount of the purchase price it earned from sales of the Fancy Feast tuna products to Plaintiff and Class members or, at a minimum, the difference between the price it was able to charge Plaintiffs and Class members for the Fancy Feast tuna products with the dolphin safe representations and sustainable fishing method representations and the price they would have been able to charge absent the same.

116.   Defendant has profited from its unlawful, unfair, false, misleading, and deceptive practices and advertising at the expense of Plaintiffs and Class members, under circumstances in which it would be unjust for Defendant to be permitted to retain the benefit.

117.   Plaintiffs do not have an adequate remedy at law against Defendant.

Class Action Complaint

118. Plaintiffs and Class members are entitled to restitution of all monies paid for the Fancy Feast tuna products or, at a minimum, the premium paid for the Fancy Feast tuna products.

## PRAYER FOR RELIEF

Wherefore, Plaintiffs pray for a judgment:

A. Certifying the Classes as requested herein;

B. Issuing an order declaring that Defendant has engaged in unlawful, unfair, and deceptive acts and practices in violation of the consumer fraud laws in the certified states;

C. Enjoining Defendant's conduct and ordering Defendant to engage in a corrective advertising campaign;

D. Awarding restitution of Defendant's revenues to Plaintiffs and the proposed Class members;

E. Awarding the Classes damages, including statutory and punitive damages, and interest thereon;

F. Awarding attorneys' fees and costs; and

G. Providing such further relief as may be just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial of their claims by jury to the extent authorized by law.

Dated: May 13, 2019

BONNETT, FAIRBOURN, FRIEDMAN
& BALINT, P.C.

 /s/*Patricia N. Syverson*
Patricia N. Syverson (203111)
Manfred P. Muecke (222893)
600 W. Broadway, Suite 900
San Diego, California 92101
psyverson@bffb.com
mmuecke@bffb.com
Telephone: (619) 798-4593

- 36 -
Class Action Complaint

BONNETT, FAIRBOURN, FRIEDMAN &
BALINT, P.C.
Elaine A. Ryan (*To Be Admitted Pro Hac Vice*)
Carrie A. Laliberte (*To Be Admitted Pro Hac Vice*)
2325 E. Camelback Rd., Suite 300
Phoenix, AZ 85016
eryan@bffb.com
claliberte@bffb.com
Telephone:  (602) 274-1100

GOLDMAN SCARLATO & PENNY P.C.
Brian D. Penny (*To Be Admitted Pro Hac Vice*)
penny@lawgsp.com
8 Tower Bridge, Suite 1025
161 Washington Street
Conshohocken, Pennsylvania 19428
Telephone:  (484) 342-0700

ZAREMBA BROWN PLLC
Brian M. Brown (*To Be Admitted Pro Hac Vice*)
bbrown@zarembabrown.com
40 Wall Street, 52nd Floor
New York, NY 10005
Telephone: (212) 380-6700

ROBBINS GELLER RUDMAN & DOWD LLP
Stuart A. Davidson (*To Be Admitted Pro Hac Vice*)
Christopher C. Gold (*To Be Admitted Pro Hac Vice*)
Bradley M. Beall (*To Be Admitted Pro Hac Vice*)
sdavidson@rgrdlaw.com
cgold@rgrdlaw.com
bbeall@rgrdlaw.com
120 East Palmetto Park Road, Suite 500
Boca Raton, FL  33432
Telephone:  (561) 750-3000

Attorneys for Plaintiffs