1
BONNETT, FAIRBOURN, FRIEDMAN
& BALINT, P.C.
2
PATRICIA N. SYVERSON (CA SBN 203111)
MANFRED P. MUECKE (CA SBN 222893)
3
600 W. Broadway, Suite 900
San Diego, California 92101
4
psyverson@bffb.com
mmuecke@bffb.com
5
Telephone: (619) 798-4593

6
BONNETT, FAIRBOURN, FRIEDMAN
& BALINT, P.C.
7
ELAINE A. RYAN (*To Be Admitted Pro Hac Vice*)
CARRIE A. LALIBERTE (*To Be Admitted Pro Hac Vice*)
8
2325 E. Camelback Rd. Suite 300
Phoenix, AZ 85016
9
eryan@bffb.com
claliberte@bffb.com
10
Telephone: (602) 274-1100
*Attorneys for Plaintiffs*
11
*Additional Attorneys on Signature Page*

12
**UNITED STATES DISTRICT COURT**
13
**CENTRAL DISTRICT OF CALIFORNIA**

14
LORI MYERS, ALISON CULLEN,
and ALEXANDER MOUGANIS, On
15
Behalf of Themselves and All Others
Similarly Situated,
16

17
               Plaintiffs,
18
        v.
19

20
NESTLE PURINA PETCARE
COMPANY, a Missouri company,
21

22
               Defendant.
23

24

25

26

27

28

Case No.:    5:19-cv-00898 GW (SPx)

**FIRST AMENDED CLASS ACTION COMPLAINT FOR:**

1.   VIOLATION OF THE RACKETEER
     INFLUENCED AND CORRUPT
     ORGANIZATIONS ACT, 18 U.S.C. §§
     1962(c)-(d);
2.   VIOLATION OF THE UNFAIR
     COMPETITION LAW, Business and
     Professions Code §17200 *et seq.*;
3.   VIOLATION OF THE CONSUMERS
     LEGAL REMEDIES ACT, Civil Code
     §1750 *et seq.*;
4.   VIOLATION OF THE NEW YORK
     GENERAL BUSINESS LAW §349; and
5.   UNJUST ENRICHMENT

DEMAND FOR JURY TRIAL

First Amended Class Action Complaint

Plaintiffs Lori Myers, Alison Cullen, and Alexander Mouganis bring this action on behalf of themselves and all others similarly situated against Defendant Nestle Purina PetCare Company ("Nestle" or "Defendant"), and for their First Amended Class Action Complaint state:

## FACTUAL ALLEGATIONS

1.     Nestle Purina PetCare Company ("Nestle" or "Defendant") markets, sells, and distributes tuna cat food products under its Fancy Feast brand.  Nestle is headquartered in St. Louis, Missouri, and is the second largest pet food company in the world and the largest in the United States.

2.     Recognizing that "[o]ur consumers do not just care about what they eat, but they also care about how products are made and their impact on the environment and society"[1], Defendant promises consumers that "we work hard to ensure our fish and seafood come from responsible sources"[2] and that its Fancy Feast® tuna products are "Dolphin Safe" by displaying a dolphin safe logo on every Fancy Feast® tuna product label.[3]  Since the introduction of Defendant's dolphin safe policy, including

---

[1] Nestle, <u>Annual Review 2018</u>, at 4, *available at* https://www.nestle.com/asset-library/documents/library/documents/annual_reports/2018-annual-review-en.pdf (last visited June 24, 2019).

[2] Nestle, <u>Fish and Seafood</u>, Our impact, *available at* https://www.nestle.com/csv/raw-materials/fish-seafood (last visited June 24, 2019).

[3] The "Fancy Feast tuna products" include:  (1) Classic Pate Ocean Whitefish & Tuna; (2) Grilled Ocean Whitefish & Tuna in Gravy; (3) Grilled Tuna Feast in Gravy; (4) Flaked Chicken & Tuna Feast; (5) Flaked Tuna & Mackerel Feast; (6) Flaked Tuna Feast; (7) Flaked Chicken & Tuna; (8) Gourmet Naturals Tuna in Gravy; (9) Gourmet Naturals Trout & Tuna Pate; (10) Medleys Tuna Primavera with Garden Veggies & Greens in a Classic Sauce; (11) Medleys Tuna Florentine with Garden Greens in a Delicate Sauce; (12) Medleys Tuna & Shrimp Recipe with Wild Rice in Gravy; (13) Medleys White Meat Chicken & Tuna Recipe with Wild Rice & Spinach in Broth; (14) Medleys Ocean Whitefish & Tuna Florentine Pate with Cheese & Garden Greens; (15) Medleys Tuna Tuscany with Long Grain Rice & Garden Greens in a Savory Sauce; (16) Medleys Shredded Tuna Fare with Garden Greens in a Savory Broth; (17) Wet Cat Food Complement Classic Tuna & Vegetable Broths; (18) Gravy Lovers Ocean Whitefish & Tuna in Sautéed Seafood Flavor Gravy; (19) Purely Fancy Feast Natural Flaked SkipJack Tuna in Delicate Broth; (20) Purely Fancy Feast Natural White Meat Chicken & Flaked Tuna in a Delicate Broth; (21) Purely Fancy Feast Natural Tender Tongol Tuna in a Delicate Broth; (22) Light Meat Tuna

the last 4 years (the "Class Period"), however, Defendant's Fancy Feast tuna products have not been "Dolphin Safe".

3.      Plaintiffs herein allege unjust enrichment and violations of: (1) the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §1962; (2) California's Unfair Competition Law, Cal. Bus. & Prof. Code §17200, *et seq.*; (3) California's Consumers Legal Remedies Act, Cal. Civ. Code §1750, *et seq.*; and (4) the New York General Business Law §349.

4.      Plaintiffs seek, on behalf of themselves and all Class members, nationwide monetary damages, restitution, injunctive relief, and all relief deemed appropriate, arising out of Defendant's illegal scheme and conspiracy alleged herein.

## Origin of "Dolphin Safe" Tuna

5.      Prior to the development of modern purse seine fishing techniques, tropical tuna were caught one at a time using traditional pole-and-line methods. NOAA, The Tuna-Dolphin Issue, NOAA Fisheries Southwest Fisheries Science Center (Sept. 2, 2016), *available at* https://swfsc.noaa.gov/textblock.aspx?Division=PRD&ParentMenuId=228&id=1408 (last visited May 3, 2019).

6.      But by the 1950's, the development of synthetic netting that would not rot in tropical waters and hydraulically driven power-blocks needed to haul very large nets made it possible to deploy massive purse-seines (vertical net curtains closed by pulling on a chain located along the bottom to enclose the fish, much like tightening the cords of a drawstring purse) around entire schools of tuna.

7.      Recognizing that tuna schools, that swim deeper in the water, often congregate with dolphin schools that swim at observable depths, fishermen began

---

Appetizer with Scallop Cat Food Topper in a Delicate Broth; (23) Delights with Cheddar Grilled Tuna & Cheddar Cheese in Gravy; and (24) Creamy Delights Tuna Feast.  Plaintiffs reserve the right to add more products upon completion of discovery.

routinely encircling tuna *and* dolphin schools with purse seine nets and hauling the entire catch aboard.

8.      This practice led to millions of dolphins being killed as unintended by-catch.

9.      In the late 1980s, the world learned of the large numbers of dolphins indiscriminately killed by tuna fishermen. In 1988, a worldwide telecast showed video images of dolphins being killed in tuna fishing nets.  That video was captured by an undercover environmental activist posing as a ship's cook.  Public outcry was immediate and intense.

10.      Heightened public awareness of these mass dolphin deaths led to the development and enhancement of fishing regulations around the world, including a strengthening of the Marine Mammal Protection Act ("MMPA") and the enactment of the Dolphin Protection Consumer Information Act ("DPCIA") of 1990.

11.      Recognizing these indiscriminate fishing methods were also reducing consumers' enthusiasm for tuna products, the major sellers of shelf-stable tuna fish products – including Nestle's Friskies Petcare Company, Defendant's predecessor – started promising consumers that they would change their tuna fishing practices to ensure that no dolphins were harmed or killed by their tuna fishing fleets.

12.      In the ensuing 25 years, U.S. tuna sellers, including Defendant, initiated and implemented a widespread and long-term advertising and marketing campaign that continues to this day – representing to consumers that no dolphins were killed or harmed in capturing their tuna, as well as expressing their commitment to sustainably sourcing tuna.

13.      For at least the last 4 years, reasonable consumers expected that all of Defendant's Fancy Feast tuna products are dolphin safe because they have been indoctrinated to believe precisely that by Defendant's and the other tuna companies' highly effective dolphin safety and sustainable fishing practices advertising and

marketing campaign.  In fact, 98% of the prepackaged tuna sold today in the U.S. for human consumption is labeled with some "dolphin safe" representation.  Forbes, K. William Watson, 'Dolphin Safe' Labels on Canned Tuna Are A Fraud (Apr. 29, 2015), *available at* https://www.forbes.com/sites/realspin/2015/04/29/dolphin-safe-labels-on-canned-tuna-are-a-fraud/#51db16b8295e (last visited May 3, 2019).

14.    Defendant's Fancy Feast tuna products, however, are not dolphin safe.  Nor are they sustainably sourced.  Defendant's dolphin safe representations, as well as Defendant's sustainability representations, are false, misleading, and/or deceptive.

**<u>Defendant's Dolphin Safe Representations</u>**

15.    On every Fancy Feast tuna product, Defendant states that the tuna products are "Dolphin Safe" with a prominent dolphin logo set against a contrasting colored background designed to capture consumers' attention.  The Fancy Feast tuna products also include Defendant's websites which state that Defendant and its suppliers are committed to responsibly and sustainably sourcing Defendant's tuna, that the "company's pet food division has worked closely with [the Sustainable Fisheries Partnership] since 2013 to ensure the seafood that goes into its products is sustainable"[4], and that Defendant has implemented audits and verification procedures to ensure compliance.  *See, e.g.*, Purina, <u>Keeping the Future in Mind Today</u>, Sustainability, *available at* https://www.purina.com/about-purina/sustainability (last visited May 8, 2019); Nestle, <u>Fish and seafood</u>, Our Impact, *available at* https://www.nestle.com/csv/raw-materials/fish-seafood (last visited May 7, 2019).

16.    As noted by the Ninth Circuit in a recent decision, "[g]iven the choice of whether to purchase dolphin safe tuna or to purchase tuna not labeled dolphin safe, American consumers overwhelmingly chose to purchase tuna that was labeled

---

[4]    Sustainable Fisheries Partnership, <u>Nestle Purina</u>, *available at* https://www.sustainablefish.org/Programs/Industry-Partnerships/Partnership-Profiles/Nestle-Purina; Nestle, <u>Fish and seafood</u>, Our impact, *available at* https://www.nestle.com/csv/raw-materials/fish-seafood (last visited June 24, 2019).

dolphin safe. As a result, foreign tuna sellers who did not adjust their fishing methods were quickly forced out of the market." *Earth Island Institute v. Hogarth*, 494 F.3d 757, 761 (9th Cir. 2007) (rejecting Government efforts to lessen restrictions on tuna fisheries in the Eastern Tropical Pacific and upholding previous finding that best evidence available indicates that tuna fishery was having significant adverse impact on dolphin stocks).

17. The importance to consumers of dolphin safety has not lessened in the ensuing 12 years since the Court's finding, as evidenced by Defendant's continued labeling of its Fancy Feast tuna products with a dolphin safe logo and represented commitment to sustainable fishing practices.

18. In the very first paragraph of its "Nestle Responsible Sourcing Standard", Defendant acknowledges the importance to consumers of sustainable sourcing practices by claiming its responsible sourcing standards "deliver[] on consumer expectations on where our products come from and how they are made." Nestle, "Nestle Responsible Sourcing Standard", at 3, *available at* https://www.nestle.com/asset-library/documents/library/documents/suppliers/nestle-responsible-sourcing-standard-english.pdf (last visited May 1, 2019).

19. Last year, Nestle posted a web article wherein it stated "sustainable seafood … is important to … consumers", "gets consumers' attention", and "seafood sustainability is a hot-button issue … for a growing number of consumers, particularly Millennials and members of Generation Z." Nestle Professional, Quality, Sustainable Seafood Gets Consumers' Attention, Trends & Insights, *available at* https://www.nestleprofessional.us/trends/quality-sustainable-seafood-gets-consumers-attention (last visited June 24, 2019).

20. Petco Animal Supplies, Inc., the second largest U.S. retailer of pet products, in answer to "what are the driving forces behind pursuing sustainability as

a retailer," replied: "Pet parents really care about the environment, and our job is to provide them with products that are aligned with their values." Pet Age, "Sustainability Top Priority at Petco", *available at* https://www.petage.com/ sustainability-top-priority-at-petco/ (last visited May 1, 2019) (Petco's vice president of sustainability, safety, and environmental health).

21. Petco is not alone in its recognition of the importance to consumers of dolphin safety and the sustainable sourcing of seafood as evidenced by many retailers' refusal to sell tuna that is not caught using dolphin safe pole-and-line, trolling[5], or handline catch methods. *See, e.g.*, PetSmart, Environmental Sustainability Report, at 3, *available at* http://media.corporate-ir.net/ media_files/irol/19/196265/2011_Sustainability_Report_PetSmart.pdf (last visited May 1, 2019) ("As a company dedicated to improving the lives of pets and Pet Parents, we are committed to being environmentally conscious by developing innovative and sustainable approaches for our unique resource needs."); Whole Foods Market, Sustainable Canned Tuna, *available at* https://www. wholefoodsmarket.com/sustainable-canned-tuna (last visited Apr. 17, 2019) ("Our sourcing policy requires all fisheries supplying canned tuna to use pole-and-line, troll or handline catch methods" unlike "[m]uch of conventional canned tuna [which] is caught by vessels using purse seine nets with Fish Aggregating Devices (known as FADs), that attract tuna but also result in high bycatch of … other marine life."); Whole Foods Market, Canned Tuna Sourcing Policy, *available at* http://assets.wholefoodsmarket.com/www/departments/seafood/Whole_Foods_Mar ket_Canned_Tuna_Sourcing_Policy_102017.pdf (last visited Apr. 17, 2019) ("Requirements for Source Fisheries" include "1. All canned tuna must be sourced

---

[5] Method of fishing whereby one or more fishing lines with baits are drawn through the water. Monterey Bay Aquarium Seafood Watch, Fishing & Farming Methods, *available at* https://www.seafoodwatch.org/ocean-issues/fishing-and-farming-methods (last visited May 3, 2019).

from pole and line, troll, and handline fisheries. Tuna from longline or purse seine fisheries is prohibited."); PR Newswire, Safeway Announces New Sustainable Sourcing Practice for Tuna, *available at* https://www.prnewswire.com/news-releases/safeway-announces-new-sustainable-sourcing-practice-for-tuna-139096714.html (last visited Apr. 17, 2019); Albertsons/Safeway, Supplier Sustainability Guidelines and Expectations (Aug. 2015), at 21, *available at* https://suppliers.safeway.com/usa/pdf/supplier_sustainability_expectations.pdf (last visited Apr. 29, 2019) ("Suppliers are encouraged" to [n]ot use Purse-seine nets deployed on Fish Aggregation Devices (FADs) and employ alternatives such as pole and line trolling in an effort to reduce or eliminate by-catch"); H-E-B, H-E-B seafood policy, *available at* https://www.heb.com/static-page/article-template/H-E-B-Seafood-Policy (last visited Apr. 17, 2019) (for wild-caught seafood, H-E-B preferentially sources from fisheries that reduce bycatch, and H-E-B "will never knowingly buy or sell any illegal, unreported, or unregulated (IUU) fish"); Giant Eagle, Giant Eagle Tuna Policy, *available at* https://www.gianteagle.com/about-us/sustainable-seafood/tuna-policy (last visited Apr. 29, 2019) (encourages suppliers to "eliminate harvest with the use of non-entangling FADs"); Wegmans, Seafood Sustainability, *available at* https://www.wegmans.com/about-us/making-a-difference/sustainability-at-wegmans/seafood-sustainability.html (last visited Apr. 29, 2019) ("Our wild-caught seafood suppliers must meet Wegmans' high standards to source seafood that is caught responsibly" including having "[g]ear chosen to reduce bycatch.").

22.     Almost all retailers have implemented sustainable seafood sourcing policies and goals in response to customer feedback.  In addition to Petco and PetSmart and the other retailers referenced above, Kroger, for example, which operates 2,782 retail supermarkets in 35 states and the District of Columbia and serves over 9 million customers a day, has adopted a comprehensive sustainable

sourcing program in response to customer feedback received at "in-store service counters, online surveys, telephone surveys, focus groups, websites and social media" as well as its live call "Kroger Customer Connect" center.  The Kroger Family of Companies, <u>2018 Sustainability Report</u> ("Kroger Sustainability Report"), *available at* http://sustainability.kroger.com/Kroger_CSR2018.pdf (last visited Apr. 17, 2019), at 12.

23.    The special "Dolphin Safe" logo Defendant includes on each Fancy Feast tuna product as shown below is intended to convey the message 100% dolphin safe – meaning no dolphins were killed or seriously injured in capturing Defendant's Fancy Feast tuna:



24.    However, unbeknownst to consumers, substantial numbers of dolphins and other marine life are killed and harmed by the fishermen and fishing methods used to catch Defendant's tuna.  Thus, Defendant's dolphin safe label representations are false, misleading, and/or deceptive.

**<u>Dolphin Safety Legislation</u>**

25.    Since the 1980s, Congress has passed a series of laws to protect dolphins and other marine life from indiscriminate fishing methods.  Beginning with the MMPA, which Congress repeatedly strengthened in 1984, 1988, and 1992, Congress "ban[ned] importation of tuna that failed to meet certain conditions regarding dolphin mortality."  *Earth Island Institute v. Evans*, No. C 03-0007-THE, ECF No. 293 at 3 (N.D. Cal.).

26.     Then, in 1990, Congress passed the DPCIA, which created the dolphin safe mark.  16 U.S.C. 1385.  The Act provided that tuna could *only* be labeled with the official "dolphin safe" mark codified at 50 CFR §216.95 if, *inter alia*, the tuna was not caught in the Eastern Tropical Pacific ("ETP") using nets intentionally deployed on or to encircle dolphins, was certified as dolphin safe by an independent observer on the tuna boat, *and* can be traced from the fishery, to the cannery, to the shelf.  *Id.*

27.     The DPCIA imposes heightened dolphin safety requirements which are not limited to ETP fisheries on manufacturers, like Defendant, who label their products with alternative dolphin safe marks.  16 U.S.C. §1385(d)(3).

28.     The DPCIA-established official dolphin safe mark is codified at 50 CFR §216.95.  That official mark contains the words "U.S. Department of Commerce", along with the words "Dolphin Safe" in red next to a blue-colored dolphin profile facing the upper left, and a tricolor (light blue, blue, and dark blue) banner along the bottom of the mark that overlaps with the dolphin's fluke:



29.     Defendant elected *not* to utilize the DPCIA official dolphin safe logo. By placing an alternative "dolphin safe" logo on Fancy Feast tuna products, rather than the official mark, Defendant voluntarily assumed the *heightened* dolphin safety

requirements under the DPCIA applicable to *all* locations where Defendant captures its tuna and to *all* fishing methods used whether nets or other gear.  Pursuant to the regulations, Defendant *must* ensure that (1) "***no*** dolphins were killed or seriously injured in the sets or other gear deployments in which the tuna were caught" (emphasis added); and (2) "the label is supported by a tracking and verification program" throughout the fishing, transshipment and canning process, "periodic audits and spot checks" are conducted, and Defendant must provide "timely access to data required".  16 U.S.C. §§1385(d)(3)(C) and (f).

30.    To be clear, the Act and implementing regulations specify that "no" dolphin must be "killed or seriously injured" and if "a" dolphin "was killed or seriously injured [defined as 'any injury that will likely result in mortality' (50 CFR §216.3)]" the tuna is *not dolphin safe* and must be *stored physically separate* from tuna that is dolphin safe and *must be supported by sufficient documentation* to enable the National Marine Fisheries Service to trace the non-dolphin safe tuna back to the fishing trip.  50 CFR §216.91.

31.    Plaintiffs allege that Defendant falsely represents that Fancy Feast tuna products are "dolphin safe" – meaning "no" dolphins were killed or seriously injured – when Defendant's tuna fishing practices kill or harm substantial numbers of dolphins each year.  And because Defendant admittedly does not adequately trace or otherwise identify the tuna that is not dolphin safe and physically segregate and store it separately from any tuna that may be dolphin safe (if any), Defendant may not label any of its products as dolphin safe.

### Defendant's Fishing Practices and Violation of Its Dolphin Safe Representations

32.    Several cat food tuna companies and companies that manufacture shelf-stable tuna products for human consumption use traditional pole-and-line and trolling

1  methods of catching tuna.  These companies include American Tuna (for its Deck

2  Hand Premium Cat Food and The Cat's Fish brands) and Fish4Ever (for its tuna cat

3  food sold in the UK), which use pole-and-line to capture their tuna; Safe Catch,

4  Ocean Naturals (for its Albacore tuna), and Wild Planet, which use pole-and-line and

5  trolling; and American Tuna, Whole Foods 365 Everyday Value brand (for its

6  skipjack and albacore tuna), and Trader Joe's (for its skipjack and yellowfin tuna),

7  which exclusively use pole-and-line to capture their tuna.[6]

8      33.    While more costly, these traditional methods ensure that dolphins (and

9  other bycatch[7]) are not harmed in the fishing process because fish are caught using

10 barbless hooks and poles one at a time near the sea's surface and unintended captured

11 species are easily released.  Tuna caught by these methods are actually "dolphin

12 safe".

13     34.    Defendant is not among the tuna companies that use only dolphin safe

14 pole-and-line or trolling techniques to capture the tuna in its Fancy Feast tuna

15

16 [6] See Deck Hand Cat Food Coming Soon, *available at* https://deckhandcatfood.com/ (last visited May 7, 2019); The Cat's Fish, Home, *available at* https://thecatsfish.com/ (last visited May 7, 2019); Fish4Ever, Sustainability,

17 http://www.fish4ever.co.uk/ (last visited May 7, 2019); Safe Catch, The Safe Catch Way, *available at* https://safecatch.com/ (last visited May 3, 2019); Ocean Naturals,

18 Albacore, Responsibly Caught, *available at* https://oceannaturals.com/responsibly-caught/albacore-tuna/ (last visited May 3, 2019); Wild Planet, Good to the Core,

19 Products-Tuna, *available at* https://www.wildplanetfoods.com/products/tuna/ (last visited May 3, 2019); American Tuna, American Tuna, Home, available at

20 https://americantuna.com/ (last visited May 3, 2019); Whole Foods Market, Wild, Salt Added Tuna, 5 oz, Products>365 Everyday Value, *available at*

21 https://products.wholefoodsmarket.com/product/365-everyday-value-wild-salt-added-tuna-10e1c0 (last visited May 3, 2019); Whole Foods Market, Albacore Wild

22 Tuna, 5 oz, Products>365 Everyday Value, *available at* https://products.wholefoodsmarket.com/product/365-everyday-value-albacore-wild-

23 tuna-5-oz-b83f86 (last visited May 3, 2019); Trader Joe's, About Trader Joe's Seafood, Announcements>Customer Updates (July 17, 2013), *available at*

24 https://www.traderjoes.com/announcement/a-note-to-our-customers-about-trader-joes-seafood (last visited May 3, 2019).

25 [7] The World Wildlife Fund ("WWF") defines "bycatch" as "the incidental capture of non-target species such as dolphins, marine turtles and seabirds."  WORLD WILDLIFE

26 FUND, Bycatch, https://www.worldwildlife.org/threats/bycatch (last visited June 24, 2019).

27

28

First Amended Class Action Complaint

products.  Nor does Defendant identify the dolphin-harming fishing methods it does use on the Product labels or on its website, simply stating "our fish and seafood come from a variety of sources, including wild fisheries in oceans around the world…" Nestle, <u>Fish and seafood</u>, Our Impact, *available at* https://www.nestle.com/csv/raw-materials/fish-seafood (last visited May 7, 2019).  The unspecified "variety of sources" principally include Thai Union Group, which is based in Thailand and known for its illegal, unreported, and unregulated fishing practices,[8] and its indiscriminate use of purse seine nets and longlines to capture tuna.  Nestle, <u>Fish and seafood</u>, Our Impact, *available at* https://www.nestle.com/csv/raw-materials/fish-seafood (last visited May 7, 2019).  Both of these fishing methods kill and harm substantial numbers of dolphins.

35.    Longlines, used by Defendant, consist of a 40-80 mile long main line to which many smaller branch lines with baited hooks are attached to catch tuna. Longlines are highly indiscriminate fishing gear as they attract large numbers of target and non-target fish, as well as dolphins, that get snagged on the hooks by their mouth or other body parts when they go after the bait and then remain on the line for extended periods of time as the lines are drawn in to the vessel and the catch is obtained.  The hooked fish are retrieved by mechanically pulling the main line back onto the fishing vessel, which can take 10 hours.  As dolphins are oxygen breathers, most do not survive the 10-hour retrieval process.  And any that do are often not released.

36.    Even when dolphins are mistakenly caught by these longlines, they are often not released.  Rather, the fishermen that catch these dolphins often kill them onboard and have been photographed posing with their catch, mutilating the dolphins and removing their teeth, which can be used as currency.  Because of the harm caused

---

[8]    Greenpeace, <u>2017 Tuna Shopping Guide</u>, *available at* https://www.greenpeace.org/usa/oceans/tuna-guide/ (last visited Apr. 17, 2019).

1 to non-target fish, longlines have been condemned by environmental groups like the

2 World Wildlife Foundation ("WWF") as an unsustainable fishing practice.  WWF,

3 Bycatch, Threats, *available at* www.worldwildlife.org/threats/bycatch (last visited

4 June 24, 2019).

5     37.    Purse seine nets, used by Defendant, also trap, kill, and harm substantial

6 numbers of dolphins.  Because purse seine nets can reach more than 6,500 feet in

7 length and 650 feet deep – the equivalent of 18 football fields by 2 football fields[9]–

8 they often entrap dolphins when drawn closed, particularly because many of the purse

9 seine fishing vessels use free floating rafts of flotsam known as fish aggregating

10 devices, or FADs, to capture tuna.

11     38.    FADs are known as floating death traps because dolphins and other

12 marine life get entangled in the devices and their sheer numbers – estimated at 30,000

13 to 50,000 per year – disrupt behavior and movement patterns of dolphins and other

14 ocean species crucial to their survival.  And, as most FADs are not removed after use,

15 they pollute the oceans in direct conflict with Defendant's proclaimed goals of "zero

16 waste" and "a cleaner planet for future generations."  *See* Purina, Keeping the Future

17 in Mind Today, Sustainability, *available at* https://www.purina.com/about-

18 purina/sustainability (last visited May 7, 2019).

19     39.    While FADs are extremely effective at luring tuna, they also attract

20 dolphins – particularly in the ETP where schools of tuna routinely gather beneath

21 schools of dolphins to reduce the risk of predation.  The tuna, dolphins, and other

22 marine life are all caught in the gigantic mile circumference purse seine nets that are

23 deployed around the FAD to catch the tuna.

24

25

26 [9] Elizabeth Brown, Fishing Gear 101: Purse Seines – The Encirclers (June 6, 2016), *available at* http://safinacenter.org/2015/12/fishing-gear-101-purse-seines-the-

27 encirclers/ (last visited May 3, 2019) ("Brown 2016").

28

40.     Since the 1980s, changes in the design of nets and fishing practices that allow dolphins to escape the net have significantly reduced dolphin mortality.  Brown 2016.   Nonetheless, significant numbers of dolphins (over a thousand a year according to NOAA[10]) are still harmed by this method, as unintended bycatch can account for *more than 30%* of a ship's haul.  And, even though unintended bycatch may be still alive when dumped out of the nets onto the boat, by the time they are thrown back into the ocean, most are dead or near dead.

41.     Even when dolphins escape the purse seine nets or are released alive from the longlines and nets, dolphins are harmed by these fishing practices.

42.     Several studies have observed a number of indirect ways the fishery causes dolphin deaths, including: dolphin mother-calf separation as calves are dependent upon their mothers until weaned 1.5 years postpartum, and, even then, the calves do not reach full muscle maturation until age 3; acute cardiac and muscle damages caused by the exertion of avoiding or detangling from the FADs and purse seine nets; cumulative organ damage in released dolphins due to overheating from escape efforts; failed or impaired reproduction; compromised immune function; and unreported mortalities due to under-counting by purse-seine fishing vessels.  *See, e.g.*, U.S. Dept. of Commerce, Reilly, *et al.*, Report of the Scientific Research Program Under the International Dolphin Conservation Program Act, NOAA Technical Memorandum NMFS (Mar. 2005), at 67-71, 76 *available at* https://swfsc.noaa.gov/publications/TM/SWFSC/NOAA-TM-NMFS-SWFSC-372.PDF (last visited May 3, 2019).  *See also* Wade, *et al.*, *Depletion of spotted and spinner dolphins in the eastern tropical Pacific: modeling hypotheses for their lack of recovery*, Mar Ecog Prog Ser 343:1-14, 2007, at 11 (noting "[a] summary of recent research … clearly illustrates that the purse seine fishery has the capacity to affect

---

[10] NOAA 2016.

dolphins beyond the direct mortality observed as bycatches"); Kellar, *et al.*, *Pregnancy patterns of pantropical spotted dolphins (Stenella attenuata) in the eastern tropical Pacific determined from hormonal analysis of blubber biopsies and correlations with the purse-seine tuna fishery*, Mar Biol (2013) 160:3113-3124, at 3120 (tuna fishery reduces likelihood of female becoming pregnant or maintaining pregnancy).

43.     Additional indirect harm to dolphins and the marine environment result from discarded and abandoned fishing gear, including FADs, which is estimated to make up to 70% by weight of microplastics in the ocean and among other harms, ensnares marine life.  Defendant's use of FADs is contrary to the Global Ghost Gear Initiative to combat marine plastic pollution, which Defendant represents to the public that it supports.   Nestle, <u>Annual Review 2018</u>, at 39, *available at* https://www.nestle.com/asset-library/documents/library/documents/annual_reports/2018-annual-review-en.pdf (last visited June 24, 2019).

44.     As the indirect harmful effects of Defendant's fishing practices also "likely result in [dolphin] mortality" (50 CFR §216.3), Defendant's tuna is not dolphin safe.  It is conservatively estimated that the total reported dolphin mortality is underestimated by 10-15% for spotted dolphins and 6-10% for spinner dolphins given these indirect harmful effects and unobserved and underreported kills.  Reilly, *et al.*, 2005, at 7.

45.     Because the use of FADs, purse seine nets, and longlines are unsustainable fishing practices, several companies that supply the U.S. tuna market will not source their tuna from boats that use these indiscriminate fishing methods. But Defendant is not among these companies.

/ / /

/ / /

- 15 -

First Amended Class Action Complaint

## Defendant Does Not Track and Report the Numbers of Dolphins Killed or Maimed in Capturing Its Tuna

46.      Defendant's use of an alternative dolphin safe logo on its Fancy Feast tuna products requires it to track, audit, and spot check for accuracy that "no dolphins were killed or seriously injured in the sets or other gear deployments in which the tuna were caught" from capture, to transshipment[11], to cannery, to shelf.  And, in the event even a single dolphin is "killed or seriously injured" during the catch, Defendant must physically separate and store that catch from any tuna catches in which no dolphins were harmed (if any) and maintain records tracing the catch(es) in which dolphins were harmed back to the fishing vessel and trip.  50 CFR §216.91.

47.      Unlike fisheries in the ETP, boats in the other oceanic regions that supply Defendant's tuna are not required to have independent observers onboard to track and report the number of dolphins killed or seriously injured.   16 U.S.C. §1385(d)(1).   A declaration from the ship's captain that no purse seines were intentionally set on dolphins suffices.  16 U.S.C. §1385(d)(1)(B).  These declarations are limited to certifying that "no purse seine net was intentionally deployed on or used to encircle dolphins during the particular voyage on which the tuna was harvested" and do not require certification that FADs, gillnets, longlines and other dolphin harming fishing techniques were not used.  Nor must the captain quantify the number of dolphins killed or otherwise harmed.

48.      Instead, Defendant is solely responsible for collecting information about the number of dolphins killed or seriously injured, which Defendant fails to do. Defendant acknowledges that "identifying the precise sources for fish and seafood is

---

[11] Transfer of a shipment from one carrier, or more commonly, from one vessel to another whereas in transit. Transshipments are usually made (1) where there is no direct air, land, or sea link between the consignor's and consignee's countries, (2) where the intended port of entry is blocked, or (3) to hide the identity of the port or country of origin.   "Business Dictionary – transshipment", *available a*t http://www.businessdictionary.com/definition/transshipment.html\ (last visited Apr. 30, 2019).

difficult. For pet food, which primarily uses fish by-products, traceability is even more challenging as the typical traceability mechanisms for whole fish do not suffice." Nestle, Fish and seafood, Our Impact, *available at* https://www.nestle.com/csv/raw-materials/fish-seafood (last visited May 7, 2019).[12] What Defendant does not mention is that there is a strong financial incentive for a captain to falsely omit any report of dolphin mortality or harm, as any catch that is not "dolphin safe" is essentially worthless. And, it is relatively simple to do so as the majority of certifications are paper-based and typically filled in by hand – often after the vessel has returned to port – making it virtually impossible to adequately verify these certifications. The potential and incentive for false reporting by its tuna suppliers make it even more incumbent upon Defendant to overcome the self-proclaimed traceability "challenges" and track, trace, and report the number of dolphins killed or harmed by Defendant's tuna fishing vessels. Consistent with its admission that it does not track, audit, and spot check for accuracy its dolphin safe representation, Defendant does not answer the query on its own website "[w]here do our dog and cat food ingredients come from" as it pertains to the tuna in its Fancy Feast tuna products. Purina, Where do our dog and cat food ingredients come from?, *available at* https://www.purina.com/nutrition/nutrition-articles/where-do-our-pet-food-ingredients-come-from (last visited May 7, 2019).

49.     By purchasing its tuna from fishing vessels that use purse seine nets

---

[12] Traceability is possible as evidenced by, among other facts, American Tuna's statement that its Cat's Fish premium canned tuna "is sustainable, traceable, 3rd party audited, tested safe and labeled with the name of the fishery" and the links provided on its website introducing consumers to the fishermen who caught the tuna with photos using pole and lines go catch the tuna. The Cat's Fish, Home, *available at* https://thecatsfish.com/ (last visited May 7, 2019); The Cat's Fish, About, *available at* https://thecatsfish.com/about/ (last visited May 7, 2019). American Tuna's Deck Hand premium cat food wild caught tuna is similarly traceable to the specific catch. Lucy Towers, Sustainable Pole & Line Tuna and Deck Hand Premium Cat Food Launched, The Fish Site (May 27, 2014), *available at* https://thefishsite.com/articles/sustainable-pole-line-tuna-and-deck-hand-premium-cat-food-launched (last visited May 7, 2019).

deployed around FADs and/or longlines, each of which harms and kills dolphins, Defendant is able to reduce its product costs and more effectively compete with other tuna companies for a bigger share of the cat food market.

### **Defendant's Sustainable Fishing Practices Misrepresentations**

50.     Defendant's commitment to sustainable fishing practices, including dolphin safe sourcing, is the common message in its widespread and long-term advertising campaign.   In the preamble of its Responsible Sourcing Standard, Defendant states: "Nestle's approach to Responsible Sourcing is a fundamental pillar of our purpose, enhancing quality of life and contributing to a healthier future." … "It delivers on consumers['] expectations on where our products come from and how they are made."  Nestle, Nestle Responsible Sourcing Standard (July 2018), at 3, *available at* https://www.nestle.com/asset-library/documents/library/documents/suppliers/nestle-responsible-sourcing-standard-english.pdf (last visited May 7, 2019).

51.     Recognizing that "Fish and Seafood are precious resources for our planet and all who live on it", Defendant claims it "work[s] hard to ensure our fish and seafood come from responsible sources…"  Nestle, Fish and seafood, Our Impact, *available at* https://www.nestle.com/csv/raw-materials/fish-seafood (last visited May 7, 2019).

52.     Defendant's self-proclaimed "innovative solutions" (*id.*) are set forth in its July 2018 Nestle Responsible Sourcing Standard.  Notably absent from its Responsible Sourcing Standard is the banning or effective control of FADs, longlines, or other unsustainable fishing techniques.  Nestle Responsible Sourcing Standard (July 2018), at 22.  Only "bottom trawling or dredging fishing methods, dynamite, cyanide, muro-ami or high seas drift nets" are identified as banned practices. *Id.*  And, even as to these "highly destructive" fishing methods, Defendant allows its suppliers 3 years to phase them out upon discovery and relies upon its

suppliers to self-report standards violations, which they are unlikely to do. *Id.* at 4, 23.

53.    Defendant also does not set any limits or restrictions on bycatch, other than prohibiting the capture of endangered, threatened, and protected species as identified in the International Union for Conservation of Nature's Red List. *Id.* at 22. Of the 38 species of oceanic dolphins, only 4 are included on the Red List as endangered or critically endangered and they are generally not found in the areas Defendant sources its tuna – primarily Indonesia, Malaysia, Myanmar, and Thailand.[13]    IUCN    Red    List,    Irrawaddy    Dolphin,    *available    at* https://www.iucnredlist.org/species/15419/123790805 (last visited May 7, 2019); IUCN    Red    List,    Hector's    Dolphin,    *available    at* https://www.iucnredlist.org/species/4162/44199757 (last visited May 7, 2019); IUCN    Red    List,    Indian    Ocean    Humpback    Dolphin,    *available    at* https://www.iucnredlist.org/species/82031633/82031644 (last visited May 7, 2019); IUCN    Red    List,    Atlantic    Humpback    Dolphin,    *available    at* https://www.iucnredlist.org/species/20425/123792572 (last visited May 7, 2019).

54.    There is no evidence that Defendant will act any time soon to halt its destructive and dolphin-harming fishing practices, notwithstanding its membership in the Sustainable Fisheries Partnership ("SFP"), whose "ambition has always been to see that 100% of seafood worldwide is produced sustainably" through "industry-driven change". Sustainable Fisheries Partnership, Home, *available at* https://www.sustainablefish.org/ (last visited May 7, 2019).    According to SFP, "[t]his is obviously a distant and aspirational goal, likely many decades away into the future…"[14], of which Defendant's tuna fishing practices confirm.

---

[13] Nestle, Fish and seafood, Our impact, *available at* https://www.nestle.com/csv/raw-materials/fish-seafood (last visited June 24, 2019).
[14]    Sustainable    Fisheries    Partnership,    Target    75,    *available    at* https://www.sustainablefish.org/Programs/Target-75 (last visited May 7, 2019).

First Amended Class Action Complaint

55.   Because Defendant uses longlines, FADs, and other well-known dolphin-harming fishing techniques, notwithstanding its Responsible Sourcing Standards, Defendant's sustainability representations are false, misleading, and/or deceptive.

**<u>Defendant, Unlike Other Tuna Companies, Does Not Use<br>Dolphin Safe Tuna Fishing Methods</u>**

56.   Unlike several other tuna companies who sell to the U.S. market, Defendant has not mandated dolphin safe fishing practices in the supply chain for its Fancy Feast tuna products, such as pole-and-line, trolling, and/or handline catch methods, whereby fishermen catch one fish at a time and release unwanted species soon after a fish takes the bait.

57.   Most U.S. retailers have sustainability guidelines and expectations of their seafood suppliers that include: using recognized dolphin safe tuna capture methods, having programs in place to trace the tuna back to the boat and place of capture, and guaranteeing the catch method used.  *See, e.g.*, Whole Foods Market, <u>Sustainable Canned Tuna</u>, *available at* https://www.wholefoodsmarket.com/ sustainable-canned-tuna (last visited Apr. 17, 2019) ("Our sourcing policy requires all fisheries supplying canned tuna to use pole-and-line, troll or handline catch methods" unlike "[m]uch of conventional canned tuna [which] is caught by vessels using purse seine nets with Fish Aggregating Devices (known as FADs), that attract tuna but also result in high bycatch of … other marine life."); Whole Foods Market, <u>Canned Tuna Sourcing Policy</u> (Aug. 15, 2018), *available at* http://assets.wholefoodsmarket.com/www/departments/seafood/Whole_Foods_Mar ket_Canned_Tuna_Sourcing_Policy_102017.pdf (last visited Apr. 17, 2019) ("Requirements for Source Fisheries" include "1. All canned tuna must be sourced from pole and line, troll, and handline fisheries. Tuna from longline or purse seine fisheries is prohibited."); PR Newswire, <u>Safeway Announces New Sustainable</u>

*Sourcing   Practice   for   Tuna*   (Feb.   10,   2012),   *available   at* https://www.prnewswire.com/news-releases/safeway-announces-new-sustainable-sourcing-practice-for-tuna-139096714.html   (last   visited   Apr.   17,   2019); Albertsons/Safeway, <u>Supplier Sustainability Guidelines and Expectations</u> (August 2015),   at   21,   *available   at*   https://suppliers.safeway.com/usa/pdf/ supplier_sustainability_expectations.pdf (last visited Apr. 29, 2019) ("Suppliers are encouraged" to "[n]ot use Purse-seine nets deployed on Fish Aggregation Devices (FADs) and employ alternatives such as pole and line trolling in an effort to reduce or   eliminate   by-catch");   H-E-B,   <u>H-E-B   seafood   policy</u>,   *available   at* https://www.heb.com/static-page/article-template/H-E-B-Seafood-Policy   (last visited Apr. 17, 2019) (for wild-caught seafood, H-E-B preferentially sources from fisheries that reduce bycatch, and H-E-B "will never knowingly buy or sell any illegal, unreported, or unregulated (IUU) fish"); Giant Eagle, <u>Tuna Policy</u>, *available at*   https://www.gianteagle.com/about-us/sustainable-seafood/tuna-policy   (last visited Apr. 29, 2019) (encourages suppliers to "eliminate harvest with the use of non-entangling   FADs");   Wegmans,   <u>Seafood   Sustainability</u>,   *available   at* https://www.wegmans.com/about-us/making-a-difference/sustainability-at-wegmans/seafood-sustainability.html (last visited Apr. 29, 2019) ("Our wild-caught seafood suppliers must meet Wegmans' high standards to source seafood that is caught responsibly" including having "[g]ear chosen to reduce bycatch."); Sprouts, <u>Sustainable Seafood Policy</u>,   *available at*   https://about.sprouts.com/product-sourcing/sustainable-seafood-policy/ (last visited Apr. 17, 2019); Publix, <u>Publix Sustainability Report 2019</u>,   *available at*   https://sustainability.publix.com/wp-content/uploads/sustainability-report.pdf (last visited Apr. 17, 2019) (supplier commitment to sustainable fishing "helps us decide whether to sell a product, enhance fisheries through improvement projects or halt the sale of a product until the issue is resolved.").

58.    Pet stores also have sustainability guidelines and expectations of their pet food suppliers, including both PetSmart and Petco – the two largest pet product retailers in the U.S. with close to 3,000 retail outlets combined.  Petco, Code of Ethics and   Conduct   (2018),   *available   at*   https://s7d1.scene7.com/is/content/ PETCO/public/sourcelib/copy/about/about-petco/code-of-ethics-2018.pdf   (last visited May 8, 2019) (memorializing Petco's commitment to sustainability and setting forth standards to preserve the environment); PetSmart, Environmental Sustainability Report,   *available   at*   http://media.corporate-ir.net/media_files/ irol/19/196265/2011_Sustainability_Report_PetSmart.pdf (last visited May 1, 2019) (same).

59.    The importance of sustainability throughout the pet industry is evidenced by the formation of the Pet Sustainability Coalition in 2013, which counts both PetSmart and Petco among its approximately 100 vendor members working collectively to accelerate sustainability in the pet industry.  Tuna companies who do not use sustainable and dolphin safe catch methods and do not adhere to traceability requirements can expect retailers to refuse to sell their products.

60.    By expressing a commitment to sustainability and labeling its Fancy Feast tuna products as dolphin safe, Defendant is able to sell its Fancy Feast tuna products in several major retail stores to which it otherwise would be denied entry.

**Defendant's Dolphin Safe Sustainability Representations are
False, Misleading, and/or Deceptive**

61.    Because dolphins are killed and harmed by the fishing methods used to catch the tuna in Defendant's Fancy Feast tuna products; Defendant does not adequately track, verify, audit, and spot check the number of dolphins killed and harmed; and Defendant does not separately store the tuna that is not dolphin safe, Defendant's use of the alternative dolphin safe logo, its dolphin safe representations, and its sustainability representations are false, misleading, and/or deceptive.

62.    Reasonable consumers rightly believe that "dolphin safe" means "no" dolphins were harmed in the process of catching the tuna in Defendant's Fancy Feast tuna products.  That is precisely the regulatory definition of dolphin safe.  50 CFR §§216.3, 216.91.  And it is the message that Defendant has consistently conveyed to the public in its widespread and long-term advertising and marketing campaign.

63.    Dolphin safety matters to consumers and it materially affects their decision whether to purchase Fancy Feast tuna.  So too does the use of sustainable fishing practices that, among other things, minimize the amount of unwanted bycatch.  If consumers, including Plaintiffs, knew Defendant's Fancy Feast tuna products were not dolphin safe and/or not caught using sustainable fishing methods they would not buy Defendant's Fancy Feast tuna products, particularly because there are several competing brands of like tuna products that are dolphin safe and sustainably sourced. Thus, Plaintiffs and Class members are entitled to a full refund.

64.    Any nutrient value notwithstanding, because Defendant's false dolphin safe representations and/or unsustainable catch methods taint the entire purchase – from whether Fancy Feast tuna that is not dolphin safe and/or not sustainably caught would even be sold by retailers to whether consumers would purchase Fancy Feast tuna that was not dolphin safe and/or sustainably caught if available for purchase – consumers, like Plaintiffs here, are entitled to a full refund.   The importance consumers place upon dolphin safety and their abject distaste for indiscriminate and destructive fishing methods makes tuna pet food consumers no different from Hindus attributing zero value to beef products, or vegans attributing zero value to animal products, or vegetarians attributing zero value to meat, fish, and poultry, no matter what nutritive value these products may otherwise have. Further, if the retailers of Defendant's Fancy Feast tuna products knew they were not sustainably sourced and dolphin safe, they would refuse to sell Defendant's Fancy Feast tuna products.  This too entitles Plaintiffs and Class members to a full refund.

65.    Alternatively, Plaintiffs and Class members are entitled to the premium attributable to the dolphin safe and sustainable fishing practices misrepresentations.

66.    Plaintiffs bring this action on behalf of themselves and other similarly situated consumers who purchased the Fancy Feast tuna products to halt the dissemination of this false, misleading and deceptive advertising message, correct the misleading perception it has created in the minds of consumers, and obtain redress for those who have purchased the Fancy Feast tuna products. Based on Defendant's unjust enrichment and violations of California and New York unfair competition laws (detailed below), Plaintiffs seek damages, declaratory, injunctive, and restitutionary relief for consumers who purchased the Fancy Feast tuna products.

## JURISDICTION AND VENUE

67.    This Court has original jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331, because Plaintiffs' claims arise under RICO, 18 U.S.C. §1962.   The Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. §1367.   This Court also has jurisdiction pursuant to 28 U.S.C. §1332, as modified by the Class Action Fairness Act of 2005, because at least one member of the Class is a citizen of a different state than Defendant, there are more than 100 members of the Class, and the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs.

68.    Venue properly lies in this District pursuant to 28 U.S.C. §1391(a), because Defendant has transacted substantial business within this District within the meaning of 28 U.S.C. §1391(a), as defined in 28 U.S.C. §1391(c), and because a substantial part of the events giving rise to the claims alleged herein occurred in the Central District of California.   Specifically, Defendant marketed and sold its tuna products throughout the State of California, including throughout this District, and California Plaintiff Myers, as well as other members of the Class, purchased

Defendant's falsely advertised and labeled tuna products from retail outlets located within this District.

69.    This Court has personal jurisdiction over Defendant pursuant to 18 U.S.C. §1965(b) and (d). Defendant is authorized to conduct and do business in California, including this District.  Defendant marketed, promoted, distributed, and sold the tuna products in California, and Defendant has sufficient minimum contacts with this State and/or sufficiently availed itself of the markets in this State through its promotion, sales, distribution, and marketing within this State, including this District, to render the exercise of jurisdiction by this Court permissible.

**PARTIES**

70.    Plaintiff Lori Myers resides in Moreno Valley, California and is a citizen of California.  Throughout the relevant period, Plaintiff Myers routinely was exposed to, saw, and relied upon Defendant's dolphin safe representations by viewing the dolphin safe mark on the Fancy Feast Classic Pate Ocean Whitefish & Tuna product. Plaintiff Myers purchased the tuna product at a PetSmart near her and online through Instacart and Amazon.  Plaintiff Myers purchased the tuna products many times throughout the relevant period.  At all relevant times, Plaintiff Myers was unaware that the tuna was not dolphin safe as represented and was caught using fishing methods that are harmful to dolphins.  Had Plaintiff Myers known the tuna was not dolphin safe and/or had Defendant not represented that the tuna was dolphin safe, Plaintiff Myers would not have purchased the Nestle tuna products.  As a result, Plaintiff Myers suffered injury in fact and lost money at the time of purchase. Plaintiff Myers continues to desire to purchase Nestle tuna products that are dolphin safe, and she would purchase such a product manufactured by Defendant if it were possible to determine prior to purchase whether dolphins were harmed by Defendant's operations. Indeed, Plaintiff Myers regularly purchases online and visits stores such as PetSmart, where Defendant's tuna products are sold, but will be unable

to rely upon the dolphin safe representations and will not be able to determine if Defendant's products are dolphin safe when deciding whether to purchase the tuna products in the future.

71.   Plaintiff Alison Cullen resides in Port Washington, New York, and is a citizen of New York.  Throughout the relevant period, Plaintiff Cullen routinely was exposed to, saw, and relied upon Defendant's dolphin safe representations by viewing the dolphin safe mark on Defendant's Fancy Feast Classic Pate Ocean Whitefish & Tuna, Wet Cat Food Complement Classic Tuna & Vegetable Broths, Gravy Lovers Ocean Whitefish & Tuna in Sautéed Seafood Flavor Gravy, and Delights with Cheddar Grilled Tuna & Cheddar Cheese in Gravy products at various retailers, including Target in Port Washington, New York, Pet Supplies Plus in Manhasset, New York, and online at Chewy.com.  Plaintiff Cullen purchased the Fancy Feast tuna product on multiple occasions throughout the relevant period.  At all relevant times, Plaintiff Cullen was unaware that the Fancy Feast tuna product was not dolphin safe as represented and was caught using fishing methods that are harmful to dolphins.  Had Plaintiff Cullen known the Fancy Feast tuna product was not dolphin safe and/or had Defendant not represented that the tuna product was dolphin safe, Plaintiff Cullen would not have purchased the Fancy Feast tuna product. As a result, Plaintiff Cullen suffered injury in fact and lost money at the time of purchase.  Plaintiff Cullen continues to desire to purchase tuna products that are dolphin safe, and she would purchase such a product manufactured by Defendant if it were possible to determine prior to purchase whether dolphins were harmed by Defendant's operations. Indeed, Plaintiff Cullen regularly visits stores such as Target and Pet Supplies Plus, where Defendant's Fancy Feast tuna products are sold, but will be unable to rely upon the dolphin safe representations and will not be able to determine if Defendant's products are dolphin safe when deciding whether to purchase the Fancy Feast tuna products in the future.

72.     Plaintiff Alexander Mouganis resides in Port Washington, New York, and is a citizen of New York.  Throughout the relevant period, Plaintiff Mouganis routinely was exposed to, saw, and relied upon Defendant's dolphin safe representations by viewing the dolphin safe mark on Defendant's Fancy Feast Classic Pate Ocean Whitefish & Tuna, Wet Cat Food Complement Classic Tuna & Vegetable Broths, Gravy Lovers Ocean Whitefish & Tuna in Sautéed Seafood Flavor Gravy, and Delights with Cheddar Grilled Tuna & Cheddar Cheese in Gravy products at various retailers, including Target in Port Washington, New York, Pet Supplies Plus in Manhasset, New York, and online at Chewy.com.  Plaintiff Mouganis purchased the Fancy Feast tuna product on multiple occasions throughout the relevant period. At all relevant times, Plaintiff Mouganis was unaware that the Fancy Feast tuna product was not dolphin safe as represented and was caught using fishing methods that are harmful to dolphins.  Had Plaintiff Mouganis known the Fancy Feast tuna product was not dolphin safe and/or had Defendant not represented that the tuna product was dolphin safe, Plaintiff Mouganis would not have purchased the Fancy Feast tuna product.  As a result, Plaintiff Mouganis suffered injury in fact and lost money at the time of purchase.  Plaintiff Mouganis continues to desire to purchase tuna products that are dolphin safe, and she would purchase such a product manufactured by Defendant if it were possible to determine prior to purchase whether dolphins were harmed by Defendant's operations. Indeed, Plaintiff Mouganis regularly visits stores such as Target and Pet Supplies Plus, where Defendant's Fancy Feast tuna products are sold, but will be unable to rely upon the dolphin safe representations and will not be able to determine if Defendant's products are dolphin safe when deciding whether to purchase the Fancy Feast tuna products in the future.

73.     Defendant Nestle Purina PetCare Company is a Missouri company with its headquarters and principal place of business located at 1 Checkerboard Square, St. Louis, MO 63164, and is a citizen of Missouri.  During the time period relevant

- 27 -

First Amended Class Action Complaint

1  to Plaintiffs' claims, Defendant: produced and sold tuna products throughout the
2  United States and its territories; sold Fancy Feast tuna products to Plaintiffs and
3  others in the United States; and engaged in the false, misleading, and deceptive
4  advertising alleged in this Complaint.

5  **CLASS DEFINITION AND ALLEGATIONS**

6  74.   Plaintiffs bring this action on behalf of themselves and all other
7  similarly situated consumers pursuant to Rules 23(a), (b)(2), (b)(3), and (c)(4) of the
8  Federal Rules of Civil Procedure, and seek certification of the following Class:

9  **Nationwide Class**
10  All consumers who, within the applicable statute of limitations
    period until the date notice is disseminated, purchased the Fancy Feast
11  tuna products in the United States.

12  Excluded from this Class are Defendant and its officers,
    directors, employees and those who purchased the Fancy Feast tuna
13  products for the purpose of resale.

     75.   In addition, Plaintiff Myers seeks certification of the following
14  California-Only Class:
15

16  **California-Only Class**
    All California consumers who within the applicable statute
17  of limitations period until the date notice is disseminated,
    purchased the Fancy Feast tuna products.
18
    Excluded from this Class are Defendant and its officers,
19  directors and employees, and those who purchased the
    Fancy Feast tuna products for the purpose of resale.
20

21  76.   In addition, Plaintiffs Cullen and Mouganis seek certification of the
    following New York-Only Class:
22

23  **New York-Only Class**
    All New York consumers who within the applicable statute
24  of limitations period until the date notice is disseminated,
    purchased the Fancy Feast tuna products.
25
    Excluded from this Class are Defendant and its officers,
26  directors and employees, and those who purchased the
    Fancy Feast tuna products for the purpose of resale.

27

28  - 28 -

77.   **Numerosity**.  The members of the Classes are so numerous that their joinder is impracticable.  Plaintiffs are informed and believe that the proposed Classes contain thousands of purchasers of the Fancy Feast tuna products who have been damaged by Defendant's conduct as alleged herein.  The precise number of Class members is unknown to Plaintiffs.

78.   **Existence and Predominance of Common Questions of Law and Fact**.  This action involves common questions of law and fact, which predominate over any questions affecting individual Class members.  These common legal and factual questions include, but are not limited to, the following:

(a)   whether Defendant's dolphin safe representations and sustainable fishing practices representations are false, misleading, and/or objectively reasonably likely to deceive;

(b)   whether Defendant failed to comply with storage, traceability and verification requirements;

(c)   whether Defendant engaged in fishing practices that harmed dolphins;

(d)   whether Defendant's alleged conduct is unlawful;

(e)   whether the alleged conduct constitutes violations of the laws asserted, including whether Defendant violated RICO, 18 U.S.C. § 1962;

(f)   whether Defendant engaged in false, misleading and/or deceptive advertising;

(g)   whether the Dolphin-Unsafe RICO Enterprise was an enterprise engaged in, or the activities of which affected, interstate or foreign commerce;

(h)   whether Defendant and its RICO Co-Conspirators conducted or participated in the conduct of the Dolphin-Unsafe RICO Enterprise's affairs through a pattern of racketeering activities;

(i)   whether Defendant and its RICO Co-Conspirators knowingly participated in, devised, or intended to devise a scheme or plan to defraud, or a

scheme or plan for obtaining money or property by means of false or fraudulent pretenses, representations, promises, or omissions;

(j)     whether the statements made or facts omitted as part of the scheme were material; that is, whether they had a natural tendency to influence, or were capable of influencing, a person to part with money or property;

(k)     whether Defendant and its RICO Co-Conspirators used, or caused to be used, the mails or interstate wire transmission to carry out, or attempt to carry out, an essential part of the scheme;

(l)     what is the measure and amount of damages suffered by Plaintiffs and Class Members, and whether Plaintiffs and the Class are entitled to treble and/or punitive damages; and

(m)     whether Plaintiffs and Class members are entitled to appropriate remedies, including damages, restitution, corrective advertising, and injunctive relief.

79.     **Typicality.**  Plaintiffs' claims are typical of the claims of the members of the Classes because, *inter alia*, all Class members were injured through the uniform misconduct described above.  Plaintiffs are also advancing the same claims and legal theories on behalf of themselves and all Class members.

80.     **Adequacy of Representation.**  Plaintiffs will fairly and adequately protect the interests of Class members.  Plaintiffs have retained counsel experienced in complex consumer class action litigation, and Plaintiffs intend to prosecute this action vigorously.  Plaintiffs have no adverse or antagonistic interests to those of the Classes.

81.     **Superiority.**  A class action is superior to all other available means for the fair and efficient adjudication of this controversy.  The damages or other financial detriment suffered by individual Class members is relatively small compared to the burden and expense that would be entailed by individual litigation of their claims against Defendant.  It would thus be virtually impossible for members of the Classes,

on an individual basis, to obtain effective redress for the wrongs done to them. Furthermore, even if Class members could afford such individualized litigation, the court system could not. Individualized litigation would create the danger of inconsistent or contradictory judgments arising from the same set of facts. Individualized litigation would also increase the delay and expense to all parties and the court system from the issues raised by this action. By contrast, the class action device provides the benefits of adjudication of these issues in a single proceeding, economies of scale, and comprehensive supervision by a single court, and presents no unusual management difficulties under the circumstances here.

82.     Plaintiffs seek preliminary and permanent injunctive and equitable relief on behalf of the entire Classes, on grounds generally applicable to the entire Classes, to enjoin and prevent Defendant from engaging in the acts described and requiring Defendant to provide full restitution to Plaintiff and Class members.

83.     Unless a Class is certified, Defendant will retain monies received as a result of its conduct that were taken from Plaintiffs and Class members.

84.     Unless an injunction is issued, Defendant will continue to commit the violations alleged, and the members of the Classes and the general public will continue to be deceived and not know whether the dolphin safe representations and/or sustainable fishing methods representations are true or if the Fancy Feast tuna products continue to contain tuna caught using fishing methods that are harmful to dolphins.

85.     Likewise, particular issues under Rule 23(c)(4) are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to: (a) whether Defendant marketed and sold its Fancy Feast tuna products as "Dolphin Safe" when they were not; (b) whether Defendant's conduct was unlawful, unfair, or fraudulent

in violation of state consumer protections law; (c) whether Defendant's misrepresentations would deceive a reasonable consumer; (d) whether Defendant has been unjustly enriched; (e) whether Defendant failed to comply with federal law in branding its Fancy Feast tuna products "Dolphin Safe"; and (f) whether Defendant's misrepresentations regarding its tuna products would be material to a reasonable consumer.

**COUNT I –**
**Violation of Racketeer Influenced and Corrupt Organizations Act ("RICO"),**
**18 U.S.C. §§ 1962(c)-(d)**
**(On Behalf of the Nationwide Class)**

86. Plaintiffs repeat and re-allege the allegations contained in the paragraphs above, as if fully set forth herein.

87. Plaintiffs bring this claim against Defendant individually and on behalf of the Nationwide Class.

88. Defendant conducts its business—legitimate and illegitimate—in concert with numerous other persons and entities, including, but not limited to, Thai Union Frozen Products PCL ("TUFP"), one of Nestle's largest importers of tuna products into the United States; Thai Union Manufacturing Co., Ltd. ("TUM"), one of Nestle's canning, shipping, and importing partners for its tuna products; Songkla Canning PCL ("Songkla"), another canning company for Nestle's tuna products; Southeast Asian Packaging and Canning Co., Ltd. ("SEAPAC"), a canning, packaging, and importing company for Nestle based in Thailand; and various other fishing, import/export, packaging, labeling, and distributing companies currently unknown to Plaintiffs (collectively, the "RICO Co-Conspirators").

89. At all relevant times, Defendant and its RICO Co-Conspirators have each been a "person" under 18 U.S.C. §1961(3) because each was capable of holding "a legal or beneficial interest in property."

90. Section 1962(c) of RICO makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. §1962(c).

91. Section 1962(d) of RICO makes it unlawful for "any person to conspire to violate" section 1962(c), among other provisions. *See* 18 U.S.C. §1962(d).

92. As part of a strategy to save millions if not billions of dollars and convince consumers to purchase its tuna products, Defendant and its RICO Co-Conspirators concocted a scheme in or before 2015, and continuing throughout the Class Period, to falsely represent, in various pieces of mail, through wires, and on the Internet, that Defendant's tuna products were sustainably sourced and dolphin safe under U.S. law and regulations, including the MMPA as amended, 16 U.S.C. §1361, *et seq.*, the DPCIA, 16 U.S.C. §1385, *et seq.*, and 50 CFR §216.95. In making these express representations, Defendant falsely assured the public and regulators that its tuna products were sustainably sourced and that "no" dolphins were killed or seriously injured, that Defendant adequately traces or otherwise identifies its tuna that is not dolphin safe, and that Defendant physically segregates and stores tuna that is not dolphin safe separately from any tuna that may be dolphin safe.

93. Defendant and its RICO Co-Conspirators' scheme is similar to that of Volkswagen, General Motors, Fiat Chrysler, and other automobile manufacturers and parts suppliers who brazenly violated federal and state emissions laws and regulations, concomitantly deceiving consumers, car dealers, and regulatory bodies alike, by marketing and labeling their vehicles as "clean" and "eco" friendly when, in fact, the vehicles contained undisclosed emission control devices that served to "defeat" emissions testing under the Clean Air Act, and actually significantly increased NOx emissions when activated. RICO allegations against these companies

have repeatedly been upheld by the federal judiciary. *See, e.g.*, *Bledsoe v. FCA US LLC*, No. 16-14024, 2019 WL 1379588, at *16 (E.D. Mich. Mar. 27, 2019); *In re Chrysler-Dodge-Jeep Ecodiesel Mktg., Sales Practices, & Prod. Liab. Litig.*, 295 F. Supp. 3d 927, 984 (N.D. Cal. 2018); *In re Duramax Diesel Litig.*, 298 F. Supp. 3d 1037, 1087 (E.D. Mich. 2018); *In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prod. Liab. Litig.*, No. MDL 2672 CRB (JSC), 2017 WL 4890594, at *18 (N.D. Cal. Oct. 30, 2017).

94.     As alleged in detail above, once the consuming public became aware in the late 1980s that large numbers of dolphins were being indiscriminately killed by tuna fishermen, public outcry and demand for more responsible fishing practices was intense and continues to this day.

95.     Along with other canned tuna companies, Defendant began promising consumers that the tuna it sold would ***only*** be procured through sustainably sourced and dolphin safe fishing practices.  Defendant thereafter implemented a widespread and long-term marketing campaign that continues to this day – expressly representing to consumers its commitment to sustainably sourcing tuna, that no dolphins are killed or harmed in capturing its tuna, and that it is in compliance with federal laws and regulations regarding the use of a special "Dolphin Safe" logo on its tuna products.

96.     However, Defendant was either unable or unwilling to conduct its tuna fishing activities within the constraints of the law, and so it devised a scheme outside of it.  Instead of spending money on more expensive tuna fishing, tracing and segregation operations as the laws required to label tuna as dolphin safe (or simply coming clean by removing its dolphin safe logo and retracting its dolphin safe promises), Defendant and its RICO Co-Conspirators agreed to continue using cost-saving, unsustainable tuna fishing methods that kill and otherwise harm dolphins.

97.     These methods were concealed from, among other persons and entities: consumers throughout the United States, including California (on Defendant's tuna

product packaging, labeling, and the Internet); port authorities where Defendant's tuna is off-loaded and processed; the U.S. National Oceanic and Atmospheric Administration ("NOAA") in, among other things, NOAA's Form 370[15] and Captain Statements,[16] both part of NOAA's "Fisheries' Tuna Tracking and Verification Program;" and other tracing and tracking reports.

98.    To accomplish their scheme or common course of conduct, Defendant and its RICO Co-Conspirators, along with others, had to work together to conceal the truth.  Each of them was employed by, hired by, or associated with, and conducted or participated in the affairs of, a RICO enterprise (defined below and referred to as the "Dolphin-Unsafe RICO Enterprise" or the "Enterprise").  The purpose of the Dolphin-Unsafe RICO Enterprise was to deceive regulators, retailers, and consumers into believing that Defendant's tuna products were sustainably sourced and "Dolphin Safe" as that term is defined by U.S. laws and regulations.  The motivation was simple: to increase Defendant's revenue by promising consumers its tuna products were dolphin safe, while also minimizing its costs by not adopting more expensive tuna fishing, tracing, and segregation operations that would comply with the law.  As a direct and proximate result of their fraudulent scheme and common course of conduct, Defendant and its RICO Co-Conspirators were able to extract billions of dollars from consumers. As explained below, their years-long misconduct violated Sections 1962(c) and (d).

**A. Description of the Dolphin-Unsafe RICO Enterprise**

99.    A subsidiary of Swiss conglomerate Nestle S.A., Defendant is one of the largest pet food companies in the United States, providing consumers with a wide-range of pet food, snacks, and cat litter products, including its Fancy Feast® gourmet

---

[15]   https://www.fisheries.noaa.gov/national/marine-mammal-protection/noaa-form-370-fisheries-certificate-origin (last visited May 2, 2019).
[16]   https://www.fisheries.noaa.gov/national/marine-mammal-protection/captains-statement-templates (last visited May 2, 2019).

cat food tuna products. Defendant uses fishing vessels owned by companies currently unknown to Plaintiffs, as well as those companies' fishermen, to catch and procure tuna for use in Defendant's tuna products. Defendant uses, among others, TUFP, TUM, and SEAPAC to import its tuna into the United States, including into California. Defendant uses, among others, TUM, Songkla, and SEAPAC to store and package its tuna products. Defendant uses a network of distributors to supply its tuna products throughout the United States for sale to consumers. Throughout this process, Defendant and its RICO Co-Conspirators sent through the mails and wires, among other things, consumer tuna products with product labels, Internet website postings, invoices, wire payment records, shipping manifests, bills of lading, NOAA Form 370s, Captain Statements, and tracing and tracking reports which all identified the tuna being sold as sustainably sourced and dolphin safe, when it was not.

100.   At all relevant times, Defendant and its RICO Co-Conspirators, along with other individuals and entities, including unknown third parties involved in the procuring, processing, exporting, importing, labeling, packaging, distributing, and sale of Defendant's tuna products, operated an association-in-fact enterprise, which was formed for the purpose of fraudulently marketing, advertising, and labeling Defendant's tuna products as "sustainably sourced" and "Dolphin Safe" and deceiving consumers and retailers, as well as federal regulators at the Department of Commerce and NOAA, in order to sell Defendant's tuna products throughout the United States (and California), and through which enterprise they conducted a pattern of racketeering activity under 18 U.S.C. §1961(4).

101.   At all relevant times, the Dolphin-Unsafe RICO Enterprise constituted a single "enterprise" or multiple enterprises within the meaning of 18 U.S.C. §1961(4), as legal entities, as well as individuals and legal entities associated-in-fact for the common purpose of engaging in Defendant's and the RICO Co-Conspirators' unlawful profit-making scheme.

102.   The association-in-fact Dolphin-Unsafe RICO Enterprise consisted of at least the following entities and individuals, and likely others:

### 1.   Nestle Purina PetCare Company

103.   Nestle, the Defendant in this action, is the second largest pet food company in the world and the largest in the United States.  One of its line of pet food products is the Fancy Feast brand of cat food, which includes several varieties of tuna products.  Nestle is wholly owned by Swiss conglomerate Nestle S.A.  Nestle is a distinct legal entity, controlled and owned by Nestle S.A.  As more fully detailed herein, Nestle conspired with TUFP, TUN, Songkla, SEAPAC, and other entities and individuals to procure, process, package, label, and sell tuna products as sustainably sourced and dolphin safe when they are not, to package and label Defendant's tuna products with false and material misrepresentations, and to gather information for submission to port authorities and regulators in the Form 370s and Captain Statements.  TUFP and TUM's parent company, Thai Union Group PCL, is a participating company with, and founding member of, the International Seafood Sustainability Foundation ("ISSF").

104.   Created in 2009, the ISSF purports to be a non-profit conservation group whose mission is to undertake science-based initiatives for the long-term conservation and sustainable use of tuna stocks, reducing bycatch and promoting ecosystem health.  In reality, the ISSF is simply a clever way for canned tuna companies to disguise their poor environmental and sustainability records insofar as the ISSF was founded by the world's largest canned tuna industry companies, is funded by corporate donations from the canned tuna giants and tuna fishing device manufacturers, among others, is linked to tuna industry trade organizations, such as the National Fisheries Institute, and has generally bowed to the whims and wishes of its industry members rather than truly working to reduce the slaughter of dolphins and sustain the global tuna population.

105.   Nestle knew or recklessly disregarded that its tuna products sold to Plaintiffs and the Class were not sustainably sourced and did not comply with U.S. laws and regulations for labeling the products dolphin safe, and yet concealed this information from consumers, retailers, and regulators.

106.   Working with other members of the Dolphin-Unsafe RICO Enterprise, Nestle conspired to procure, process, package, label, and sell tuna products that are neither sustainably sourced nor dolphin safe to deceive consumers and illegally circumvent stringent U.S. laws and regulations.   Employing these illegal practices, Nestle fraudulently told consumers that its tuna products were "sustainably sourced" and "dolphin safe," and submitted false dolphin safe statements to port authorities, the U.S. Department of Commerce (including NOAA), and in written and online marketing and advertising for Nestle's tuna products.

## 2.   The Co-Conspirator Fishing Vessel Entities and Individuals

107.   As explained above, unknown third-party fishing vessel companies and employees supplied tuna to Defendant for processing and sale that is neither sustainably sourced nor dolphin safe, knowing that Defendant would package, label, market, and sell its tuna products to Plaintiffs and the Class as sustainably sourced and dolphin safe and compliant with federal laws and regulations.   On information and belief, these RICO Co-Conspirators further supplied false Captain Statements to Defendant knowing that such Captain Statements were false and, if the truth were known, Defendant would not be able to package, label, market, and sell its tuna products to the Class as dolphin safe, sustainably sourced, and compliant with federal laws and regulations.

108.   These unknown third-party RICO Co-Conspirator fishing vessel companies and employees were key to the conspiracy with Defendant enabling Defendant to sell its tuna to consumers as dolphin safe and sustainably sourced.

109.   These unknown third-party RICO Co-Conspirator fishing vessel companies and employees worked with Defendant to design and implement the scheme by using cheaper and more efficient tuna fishing techniques they knew would result in the killing and harming of dolphins and render false Defendant's dolphin safe and sustainably sourced representations to consumers and retailers in the United States, and by submitting false Captain Statements and other documents to Defendant they knew would be relied upon to permit Defendant to import, process and sell its tuna as dolphin safe and sustainably sourced.

110.   Put simply, these unknown third-party RICO Co-Conspirator fishing vessel companies and employees were well aware that the tuna they procured on their fishing vessels for Defendant would be used to defraud consumers, retailers, and federal regulators.   Indeed, these companies and individuals were critical to the concealment of the truth from consumers, retailers, and federal regulators regarding Defendant's tuna products.

### 3.   The Co-Conspirator Importers and Individuals

111.   RICO Co-Conspirators TUFP, TUM, and SEAPAC, and their employees, among other third-party importers and employees unknown to Plaintiffs, imported Defendant's tuna products for sale, knowing that Defendant would market and sell its tuna products to Plaintiffs and the Class as dolphin safe, sustainably sourced, and compliant with federal laws and regulations.   On information and belief, these RICO Co-Conspirators further supplied false bills of lading in connection with the importation of the tuna products into the United States knowing that such bills of lading were false and, if the truth were known, Defendant would not be able to package, label, market, and sell its tuna products to the Class as dolphin safe, sustainably sourced, and compliant with federal laws and regulations.

112.   RICO Co-Conspirators TUFP, TUM, and SEAPAC, and their employees, among other third-party fishing importers and employees unknown to

First Amended Class Action Complaint

Plaintiffs, were key to the conspiracy with Defendant enabling Defendant to sell its tuna to consumers as dolphin safe and sustainably sourced.

113. RICO Co-Conspirators TUFP, TUM, and SEAPAC, and their employees, among other third-party importers and employees unknown to Plaintiffs, worked with Defendant to design and implement the scheme by importing tuna that was neither dolphin safe nor sustainably caught which they knew would render false Defendant's dolphin safe and sustainability representations to consumers and retailers in the United States, and by submitting false bills of lading and other documents to port authorities and regulators they knew would be relied upon to permit Defendant to import, process and sell its tuna as dolphin safe and sustainably sourced.

114. Put simply, RICO Co-Conspirators TUFP, TUM, and SEAPAC, and their employees, among other third-party importers and employees unknown to Plaintiffs, were well aware that the tuna they imported for Defendant into the United States would be used to defraud consumers, retailers, and federal regulators. Indeed, these companies and individuals were critical to the concealment of the truth from consumers, retailers, and federal regulators regarding Defendant's tuna products.

### 4. The Co-Conspirator Storage, Canning, and Processing Entities and Individuals

115. RICO Co-Conspirators TUM, Songkla, and SEAPAC, and their employees, among other third-party storage, canning, and processing companies and employees unknown to Plaintiffs, stored, canned, and processed Defendant's tuna products for sale, knowing that Defendant would market and sell its tuna products to Plaintiffs and the Class as dolphin safe, sustainably sourced, and compliant with federal laws and regulations. Indeed, these RICO Co-Conspirators were tasked by Defendant with physically segregating and storing non-dolphin-safe tuna separately from any tuna that may be dolphin safe (if any), which they did not do.

116.   RICO Co-Conspirators TUM, Songkla, and SEAPAC, and their employees, among other third-party storage, canning, and processing companies and employees unknown to Plaintiffs, were key to the conspiracy with Defendant enabling Defendant to sell its tuna to consumers as dolphin safe and sustainably sourced.

117.   RICO Co-Conspirators TUM, Songkla, and SEAPAC, and their employees, among other third-party storage, canning, and processing companies and employees unknown to Plaintiffs, worked with Defendant to design and implement the scheme by storing, canning, and processing tuna that was neither dolphin safe, nor sustainably caught, nor properly segregated from actual dolphin-safe tuna, which they knew would render false Defendant's dolphin safe and sustainability representations to consumers and retailers in the United States.

118.   Put simply, RICO Co-Conspirators TUM, Songkla, and SEAPAC, and their employees, among other third-party storage, canning, and processing companies and employees unknown to Plaintiffs, were well aware that the tuna they stored, processed, and canned for Defendant prior to importing into the United States would be used to defraud consumers, retailers, and federal regulators.   Indeed, these companies and individuals were critical to the concealment of the truth from consumers, retailers, and federal regulators regarding Defendant's tuna products.

**B. The Dolphin-Unsafe RICO Enterprise Sought to Increase Defendant's Profits and Revenues, as well as Their Own**

119.   As alleged in detail above, tuna-fishing techniques that meet the "dolphin safe" and "sustainably sourced" standards (not used by Defendant and its RICO Co-Conspirators) are more expensive than other techniques.   They are more time consuming, require more manpower, and are less efficient because fish are caught using barbless hooks and poles one at a time, rather than en masse with longlines or enormous purse seine nets.   Consequently, Defendant and its RICO Co-

Conspirators' bottom lines are greatly increased by the indiscriminate killing and harming of dolphins while fishing for tuna.

120.   The Dolphin-Unsafe RICO Enterprise began well before the beginning of the Class Period. On information and belief, Defendant has entered into numerous agreements with third-party fishing vessel companies unknown to Plaintiffs to procure tuna to be used in Defendant's tuna products sold to Plaintiffs and the Class. Defendant has also entered into numerous agreements with TUFP, TUM, and SEAPAC to import Defendant's tuna products, and with TUM, Songkla, and SEAPAC to store, process, and can Defendant's tuna products.

121.   The scheme continues to this day, as consumers, retailers, and federal regulators remain in the dark about the truth of Defendant's so-called "sustainably sourced" and "dolphin safe" tuna products.

122.   At all relevant times, the Dolphin-Unsafe RICO Enterprise: (a) had an existence separate and distinct from Defendant and each RICO Co-Conspirator; (b) was separate and distinct from the pattern of racketeering in which Defendant and each RICO Co-Conspirator engaged; and (c) was an ongoing and continuing organization consisting of legal entities, including Defendant; third-party fishing vessel companies and fishermen; TUFP, TUM, SEAPAC, and Songkla and their employees; and other entities and individuals associated for the common purpose of procuring, storing, processing, importing, packaging, labeling, distributing, marketing, and selling of Defendant's tuna products to consumers in the Class through fraudulent representations in, among other places, consumer-facing product packaging and labels, Internet websites, marketing and advertising to consumers, bills of lading, Form 370s, and Captain Statements, and deriving profits and revenues from those activities. Each member of the Dolphin-Unsafe RICO Enterprise shared in the bounty generated by the enterprise, *i.e.*, by sharing the benefit derived from

1   increased sales revenue generated by the scheme to defraud Class members
2   nationwide.

3        123.   The Dolphin-Unsafe RICO Enterprise functioned by selling
4   Defendant's tuna products to the consuming public. All of these products are
5   illegitimate.   Defendant and its RICO Co-Conspirators, through their illegal
6   Enterprise, engaged in a pattern of racketeering activity, which involves a fraudulent
7   scheme to increase revenue for themselves and the other entities and individuals
8   associated-in-fact with the Enterprise's activities through the illegal scheme to sell
9   Defendant's falsely-labeled tuna products.

10       124.   The Dolphin-Unsafe RICO Enterprise engaged in, and its activities
11  affected, interstate and foreign commerce, because it involved commercial activities
12  across state and national boundaries, such as the procuring, importing, storing,
13  processing, packaging, labeling, distributing, marketing, and sale of Defendant's tuna
14  products throughout the country, and the receipt of monies from the sale of the same.

15       125.   Within the Dolphin-Unsafe RICO Enterprise, on information and belief,
16  there was a common communication network by which co-conspirators shared
17  information on a regular basis. The Enterprise used this common communication
18  network for the purpose of procuring, importing, storing, processing, packaging,
19  labeling, distributing, marketing, and selling Defendant's tuna products to the general
20  public nationwide.

21       126.   Each participant in the Dolphin-Unsafe RICO Enterprise had a
22  systematic linkage to each other through corporate ties, contractual relationships,
23  financial ties, and continuing coordination of activities.  Through the Dolphin-Unsafe
24  RICO Enterprise, Defendant and its RICO Co-Conspirators functioned as a
25  continuing unit with the purpose of furthering the illegal scheme and their common
26  purposes of increasing their revenues and market share, and minimizing losses.

27

28

127.   Defendant and its RICO Co-Conspirators participated in the operation and management of the Dolphin-Unsafe RICO Enterprise by directing its affairs, as described herein. While Defendant and its RICO Co-Conspirators participated in, and are members of, the Enterprise, they have a separate existence including distinct legal statuses, different offices and roles, bank accounts, officers, directors, employees, individual personhood, reporting requirements, and financial statements.

128.   Defendant exerted substantial control over the Dolphin-Unsafe RICO Enterprise, and participated in the affairs of the Enterprise, by:

(a) procuring tuna in a manner that does not permit a company to market and sell shelf-stable tuna products as sustainably sourced and "Dolphin Safe;"

(b) concealing that tuna products marketed and sold as sustainably sourced and "Dolphin Safe" are, in fact, not;

(c) failing to correct false statements regarding tuna products marketed and sold as sustainably sourced and dolphin safe;

(d) storing, importing, processing, packaging, labeling, distributing, marketing, and selling Defendant's tuna products that may not contain the "Dolphin Safe" representation;

(e) misrepresenting (or causing such misrepresentations to be made) Defendant's tuna products as sustainably sourced and "Dolphin Safe;"

(f) misrepresenting (or causing such misrepresentations to be made) facts in bills of lading, Form 370s filed with NOAA, and Captain Statements;

(g) introducing Defendant's tuna products into the stream of U.S. commerce with false, deceptive, and misleading representations;

(h) concealing the truth behind the tuna procured for Defendant's tuna products from regulators, retailers, and the public;

(i) misleading government regulators as to the nature of the tuna procured for Defendant's tuna products;

(j) misleading the consuming public as to the nature of the tuna procured for Defendant's tuna products;

(k) misleading retailers as to the nature of the tuna procured for Defendant's tuna products;

(l) designing and distributing marketing materials, product labels, and websites on the Internet that misrepresented Defendant's tuna products;

(m) illegally selling and/or distributing Defendant's tuna products;

(n) collecting revenues and profits from the sale of Defendant's tuna products; and/or

(o) ensuring that the RICO Co-Conspirators and unnamed co-conspirators complied with the scheme or common course of conduct.

129. The unknown third-party RICO Co-Conspirator fishing companies and fishermen and other employees also participated in, operated and/or directed the Dolphin-Unsafe RICO Enterprise. These RICO Co-Conspirators knew that federal laws and regulations forbade Defendant from importing, storing, packaging, labeling, marketing, and selling Defendant's tuna products containing tuna they procured and processed for Defendant as "sustainably sourced" and "Dolphin Safe," and yet formed agreements with Defendant to procure and process tuna for Defendant's tuna products that was neither dolphin safe nor sustainably sourced.

130. The unknown third-party RICO Co-Conspirator fishing companies and fishermen and other employees, and TUFP, TUM, SEAPAC, and Songkla and their employees, directly participated in the fraudulent scheme by procuring, storing, importing, and processing the tuna used by Defendant in its tuna products. These RICO Co-Conspirators exercised tight control over the manner and method of fishing for tuna and other aspects of the procurement, storage, importation, and distribution process and closely collaborated and cooperated with Defendant in the process.

131.   The unknown third-party RICO Co-Conspirator fishing companies and fishermen and other employees, and TUFP, TUM, SEAPAC, and Songkla and their employees, also participated in the affairs of the Enterprise by working with Defendant to conceal from U.S. regulators the truth behind the tuna caught for use in Defendant's tuna products, and collected substantial sums of money in revenues and profits because they did not use less efficient and more costly fishing techniques necessary to protect the dolphin population.  The techniques they did employ yielded higher catches at lower costs, thus increasing profits and margins on both accounts. Through their conspiracy to sell non-sustainably sourced tuna as sustainable sourced, and to sell non-dolphin safe tuna as dolphin safe, all of the co-conspirators profited handsomely from their scheme.

132.   Each of the RICO Co-Conspirators knew that the tuna they procured, stored, canned, processed, imported, and distributed was not sustainably sourced and did not meet the requirements to be labeled as dolphin safe, and also knew that the tuna would eventually be sold in the United States as dolphin safe and sustainably sourced.

133.   Without the RICO Co-Conspirators' willing participation, including their necessary involvement in procuring, storing, processing, canning, and importing tuna for use in Defendant's tuna products, the Enterprise's scheme and common course of conduct would have been unsuccessful.

134.   The RICO Co-Conspirators knew that any market for tuna products that were not dolphin safe was *very* limited, and that falsely representing that these products were dolphin safe opened up an exponentially larger market in the United States for such products.

135.   The RICO Co-Conspirators directed and controlled several aspects of the ongoing organization necessary to implement the scheme through communications with each other, with Defendant, with port authorities, and with

regulators of which Plaintiffs cannot fully know at present, because such information lies in the Defendant's and others' hands. Similarly, because many of the RICO Co-Conspirators are foreign entities, and their shipping, storing, processing, and canning companies and employees are foreign citizens, Plaintiffs cannot fully know the full extent of each individual corporate entity's and individual's involvement in the wrongdoing prior to having access to discovery.

### C. Mail and Wire Fraud

136. To carry out, or attempt to carry out the scheme to defraud, Defendant and its RICO Co-Conspirators, each of whom is a person associated-in-fact with the Dolphin-Unsafe RICO Enterprise, did knowingly conduct or participate, directly or indirectly, in the conduct of the affairs of the Enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§1961(1), 1961(5) and 1962(c), and which employed the use of the mail and wire facilities, in violation of 18 U.S.C. §1341 (mail fraud) and §1343 (wire fraud).

137. Specifically, as alleged herein, Defendant and its RICO Co-Conspirators have committed and/or conspired to commit at least two predicate acts of racketeering activity (*i.e.*, violations of 18 U.S.C. §§1341 and 1343), within the past ten years. The multiple acts of racketeering activity that Defendant and its RICO Co-Conspirators committed were related to each other, posed a threat of continued racketeering activity, and therefore constitute a "pattern of racketeering activity." The racketeering activity was made possible by Defendant's and its RICO Co-Conspirators' regular use of the facilities, services, distribution channels, and employees of the Dolphin-Unsafe RICO Enterprise.

138. Defendant and its RICO Co-Conspirators participated in the scheme to defraud by using mail, telephone, and the Internet to transmit mailings and wires in interstate or foreign commerce. Defendant and its RICO Co-Conspirators used, directed the use of, and/or caused to be used, thousands of interstate mail and wire

communications in service of their scheme through virtually uniform misrepresentations.

139.   In devising and executing the illegal scheme, Defendant and its RICO Co-Conspirators devised and knowingly carried out a material scheme and/or artifice to defraud Plaintiffs and the Class or to obtain money from Plaintiffs and the Class by means of materially false or fraudulent pretenses, representations, or promises of material facts.  For the purpose of executing the illegal scheme, Defendant and its RICO Co-Conspirators committed these racketeering acts, which number in the thousands, intentionally and knowingly with the specific intent to advance the illegal scheme.

140.  Defendant's and its RICO Co-Conspirators' predicate acts of racketeering (18 U.S.C. §1961(1)) include, but are not limited to:

(a) **Mail Fraud:** Defendant and its RICO Co-Conspirators violated 18 U.S.C. §1341 by sending or receiving, or by causing to be sent and/or received, materials via U.S. mail or commercial interstate carriers for the purpose of executing the unlawful scheme to procure, store, process, can, import, package, label, distribute, market, and sell Defendant's tuna products by means of false pretenses, misrepresentations, and promises.

(b) **Wire Fraud:** Defendant and its RICO Co-Conspirators violated 18 U.S.C. §1343 by transmitting and/or receiving, or by causing to be transmitted and/or received, materials by wire for the purpose of executing the unlawful scheme to defraud and obtain money on false pretenses, misrepresentations, and promises.

141.   Defendant's and its RICO Co-Conspirators' uses of the mails and wires include, but are not limited to, the transmission, delivery, or shipment of the following by Defendant and its RICO Co-Conspirators or third parties that were

foreseeably caused to be sent as a result of Defendant's and its RICO Co-Conspirators' illegal scheme:

(a) Defendant's tuna products and the tuna itself;

(b) sales and marketing materials, including advertising, websites, packaging, and labeling, concealing the true nature of Defendant's tuna products;

(c) documents intended to facilitate the packing, labeling, and sale of Defendant's tuna products, including bills of lading, invoices, shipping records, reports and correspondence;

(d) documents and communications that facilitated the "passing-off" of Defendant's tuna products as "Dolphin Safe" and sustainably sourced;

(e) documents to process and receive payment for Defendant's tuna products by unsuspecting Class members, including invoices and receipts;

(f) false or misleading Form 370s to NOAA;

(g) false or misleading Captain Statements;

(h) false or misleading port authority reports;

(i) false or misleading tracing and tracking reports;

(j) false or misleading communications intended to prevent regulators, retailers, and the public from discovering the true nature of Defendant's tuna products;

(k) payments to TUFP;

(l) payments to TUM;

(m) payments to Songkla;

(n) payments to SEAPAC;

(o) compensation to ship captains on tuna fishing vessels;

(p) deposits of proceeds; and/or

(q) other documents and things, including electronic communications.

142.  Defendant and its RICO Co-Conspirators (or their agents), for the purpose of executing the illegal scheme, sent and/or received (or caused to be sent and/or received) by mail or by private or interstate carrier, shipments of Defendant's tuna products and related documents by mail or a private carrier affecting interstate commerce, including the items described above and alleged below:

| From | To | Date | Description |
|------|-----|------|-------------|
| TUM (for Nestle) | Port of Oakland, CA | May 23, 2019 | Bill of Lading # APLUGAT0132019 |
| TUM (for Nestle) | Port of Kansas City, MO | May 23, 2019 | Bill of Lading # MSCUWT227623 |
| SEAPAC (for Nestle) | Port of New York/Newark | June 16, 2016 | Bill of Lading # MAEU566884729 |
| TUM (for Nestle) | Port of Kansas City, MO | June 6, 2016 | Bill of Lading # MOLU13805494215 |
| SEAPAC (for Nestle) | Port of Los Angeles, CA | June 6, 2016 | Bill of Lading # MOLU13805498801 |
| SEAPAC (for Nestle) | Port of Kansas City, MO | May 16, 2016 | Bill of Lading # MOLU13805419356 |
| TUM (for Nestle) | Port of Kansas City, MO | Apr. 19, 2016 | Bill of Lading # MSCUWT791768 |
| SEAPAC (for Nestle) | Port of Long Beach, CA | Apr. 19, 2016 | Bill of Lading # MSCUWT792493 |
| TUM (for Nestle) | Port of New York/Newark | Nov. 20, 2015 | Bill of Lading # NYKS3024672050 |
| SEAPAC (for Nestle) | Port of Long Beach, CA | Oct. 27, 2015 | Bill of Lading # MSCUWT456016 |
| SEAPAC (for Nestle) | Port of New York/Newark | June 1, 2015 | Bill of Lading # NYKS3023183592 |
| TUM (for Nestle) | Port of Kansas City, MO | April 25, 2015 | Bill of Lading # MSCUWT227623 |
| TUM (for Nestle) | Port of Long Beach, CA | Apr. 1, 2015 | Bill of Lading # MSCUWT148043 |

| TUM (for Nestle) | Port of Kansas City, MO | Feb. 1, 2015 | Bill of Lading # MSCUWT130355 |
| SEAPAC (for Nestle) | Port of Baltimore, MD | Oct. 18, 2013 | Bill of Lading # MSCUBP571363 |

143.   Defendant and its RICO Co-Conspirators (or their agents), for the purpose of executing the illegal scheme, transmitted (or caused to be transmitted) in interstate commerce by means of wire communications, certain writings, signs, signals and sounds, including those items described above and alleged below:

| **From** | **To** | **Date** | **Description** |
| --- | --- | --- | --- |
| Nestle | General Public | 12/13/17 | Nestle tweet on Twitter stating: "Discover how Nestle and Thai Union are supporting #HumanRights and #ResponsibleSourcing in the Thai fishing industry…." |
| Nestle | General Public | 2019 | Nestle webpage under tab "Sourcing" and titled "Sourcing Quality Ingredients" stating, *inter alia*, that "Sourcing is important, not just to ensure we use high-quality ingredients in our pet food products, but also for the environment. We can trace every single ingredient back to our trusted sources. Our experts don't just monitor our ingredients once they arrive at our factories—they evaluate quality from the source," "Purina is committed to minimizing our global environmental impact. That's why we make responsible sourcing of our ingredients a top priority," and "Seafood is a top priority in terms of sustainability because overfishing is such a serious issue. We work closely not only with our seafood suppliers, but also with external seafood sustainability experts, to ensure we source from responsible fisheries." https://www.purina.com/nutrition/sourcing |
| Nestle | General Public | 2019 | Nestle webpage titled "Fish and Seafood" stating, "We work hard to ensure our fish and seafood come from responsible sources, as well as bringing innovative solutions to tackle challenges such as labor conditions," "Working with our suppliers, we're moving toward a future |

| | | | |
|---|---|---|---|
| | | | where we can verify that the fish and seafood we source come from fisheries and farms that are engaged in improvement projects," "All of our suppliers are actively committed to responsible sourcing," "we work closely with our suppliers to identify, as far as possible, the sources of our fish and seafood ingredients," and "We are also able to evaluate the sustainability of seafood sources (wild and farmed) and identify projects to enhance the environmental performance of our suppliers." https://www.nestle.com/csv/raw-materials/fish-seafood |
| Nestle | General Public | 2019 | "Nestlé Purina's partnership with SFP proves that sustainable seafood production doesn't just apply to what people eat. The company's pet food division has worked closely with SFP since 2013 to ensure the seafood that goes into its products is sustainable." https://www.sustainablefish.org/Programs/Industry-Partnerships/Partnership-Profiles/Nestle-Purina |
| Nestle | General Public | 2018 | Nestle Annual Review 2018 at 32: stating that "we have made public commitments against our most material issues, which help us achieve our ambitions and ultimately support the UN Sustainable Development Goals (SDG) for 2030," including "Life below water": https://www.nestle.com/asset-library/documents/library/documents/annual_reports/2018-annual-review-en.pdf |
| Nestle | General Public | July 2018 | "Nestlé Responsible Sourcing Standard" stating, *inter alia*, that one of the "Big 5 executive summary principles" is fishers improving on "caring and respecting … animals" (p. 4), and standard 4.2.11.1 – wild fisheries, states that fishers shall "not use highly destructive fishing gear or fishing methods" and "not engage in fisheries with bycatch of Endangered, Threatened, and Protected Species as defined by national legislation or international agreements" (p. 21): https://www.nestle.com/asset-library/documents/library/documents/supp |

| | | | |
|---|---|---|---|
| | | | liers/nestle-responsible-sourcing-standard-english.pdf |
| Nestle | General Public | March 16, 2017 | Quote from Nestle's Head of Sustainability Jack Scott in Greenpeace Press Release stating, "Over the past several years, Nestlé and Greenpeace have worked together to strengthen Nestlé's policies governing the procurement and responsible sourcing of seafood" and "In light of Greenpeace's research findings, Nestlé has committed to a ban on all transshipments at sea." Press release, *Mars, Nestle Commit to Clean Up Pet Food Supply chains, Increasing Pressure on Thai Union to Act*, GREENPEACE (Mar. 16, 2017), *available at* https://www.greenpeace.org/international/press-release/7106/mars-nestle-commit-to-clean-up-pet-food-supply-chains-increasing-pressure-on-thai-union-to-act/ |
| Nestle | General Public | May 1, 2018 | Nestle Professional website posting titled "Quality, Sustainable Seafood Gets Consumers' Attention," where Nestle states, "Learn why sustainable seafood, including a traceable supply chain, is important to the planet, consumers, and you. It's more than just "doing the right thing." It's an intelligent business strategy." https://www.nestleprofessional.us/trends/quality-sustainable-seafood-gets-consumers-attention |
| Nestle | General Public | 2017 | Nestle "Responsible Sourcing" update for 2017, stating, *inter alia*, "In 2017 we continued to work with our suppliers in Thailand to map and trace the seafood that we purchase back to the vessels used. Through this work we were able to achieve 99% traceability for wild caught tuna, back to the vessel used. In practical terms, this means we can identify all of the Thai flagged vessels used to catch our tuna by name and vessel number. For all of the tuna we purchase, we are now able to receive Port In Port Out (PIPO) logs, Captains logs, and Marine Catch Purchasing documents.... We are now working with the Seafood Task Force to trace farm raised shrimp back to the fish meal sourcing vessels using the feed lot numbering process. We continue to update our traceability information on an annual |

| | | | basis. Knowing where our products come from is a critical first step in ensuring we source our seafood ingredients responsibly. https://www.nestle.com/asset-library/documents/creating-shared-value/responsible-sourcing/seafood-responsible-sourcing-update-2017.pdf |
| --- | --- | --- | --- |

144.   Defendant, in concert with the RICO Co-Conspirators, also used the internet and other electronic facilities to carry out the scheme and conceal their ongoing fraudulent activities. Specifically, Defendant, in concert with the RICO Co-Conspirators, made material misrepresentations about its tuna products on its websites, Twitter, and through ads online, all of which were made in interstate commerce and intended to mislead regulators and the public about the truth about Defendant's non-dolphin safe and unsustainably sourced tuna products.

145.   Defendant and its RICO Co-Conspirators also communicated by U.S. mail, by interstate facsimile, and by interstate electronic mail with various other affiliates, regional offices, divisions, packaging companies, distributors, grocery chains, wholesale companies, and other third-party entities in furtherance of the scheme.

146.   The mail and wire transmissions described herein were made in furtherance of Defendant's and its RICO Co-Conspirators' scheme and common course of conduct to deceive regulators, retailers, and consumers and lure consumers into purchasing Defendant's tuna products, which Defendant and its RICO Co-Conspirators knew or recklessly disregarded as not justifying the "dolphin safe" label, despite their decades-long advertising and marketing campaign that Defendant's tuna products were "Dolphin Safe" and sustainably sourced.

147.   Many of the precise dates of the fraudulent uses of the U.S. mail and interstate wire facilities have been deliberately hidden, and cannot be alleged without

access to Defendant's and its RICO Co-Conspirators' books and records.  However, Plaintiffs have described the types of, and in some instances, occasions on which the predicate acts of mail and/or wire fraud occurred.  These include thousands of communications to perpetuate and maintain the scheme, including the things and documents described in the preceding paragraphs.

148.  Defendant and its RICO Co-Conspirators have not undertaken the practices described herein in isolation, but as part of a common scheme and conspiracy. In violation of 18 U.S.C. §1962(d), Defendant and its RICO Co-Conspirators conspired to violate 18 U.S.C. §1962(c), as described herein.  Various other persons, firms and corporations, including third-party entities and individuals not named as defendants in this Complaint, have participated as additional co-conspirators with Defendant and its RICO Co-Conspirators in these offenses and have performed acts in furtherance of the conspiracy to increase or maintain revenues, increase market share, and/or minimize losses for Defendant and its RICO Co-Conspirators and their unnamed additional co-conspirators throughout the illegal scheme and common course of conduct.

149.  To achieve their common goals, Defendant and its RICO Co-Conspirators concealed from the general public the true nature of Defendant's tuna products and obfuscated the fact that the tuna in Defendant's tuna products was not dolphin safe at all or sustainably sourced.

150.  Defendant and its RICO Co-Conspirators and each member of the conspiracy, with knowledge and intent, have agreed to the overall objectives of the conspiracy, and have participated in the common course of conduct, to commit acts of fraud and indecency in procuring, processing, packaging, labeling, distributing, marketing, and/or selling Defendant's tuna products.

151.   Indeed, for the conspiracy to succeed, Defendant and each of its RICO Co-Conspirators had to agree to each play a role in the conspiracy by implementing and using similar devices and fraudulent tactics.

152.   Specifically, Defendant and its RICO Co-Conspirators committed to secrecy about the truth of Defendant's tuna products not being dolphin safe or sustainably sourced and in compliance with federal laws and regulations.

153.   Defendant and its RICO Co-Conspirators knew and intended that consumers would purchase Defendant's tuna products and incur costs as a result. Defendant and its RICO Co-Conspirators also knew and intended that government regulators would rely on their material misrepresentations made about the tuna in Defendant's tuna products to approve them for marketing and sale in the United States and each state.   Defendant and its RICO Co-Conspirators also knew and intended that retailers would rely on their material misrepresentations made about the tuna in Defendant's products to agree to offer them for sale to the general public.

154.   Plaintiffs' and the Class' reliance on this ongoing concealment is demonstrated by the fact that they purchased, and lost money or property by purchasing, falsely advertised tuna products that never should have been introduced into the U.S. stream of commerce in the manner in which they were.   In addition, NOAA and other regulators relied on the misrepresentations and material concealment and omissions made or caused to be made by Defendant and its RICO Co-Conspirators; otherwise, Defendant would never have been able to market, label, and sell its tuna products as "Dolphin Safe" and "sustainably sourced" in the United States and sell the same to the consuming public.

155.   As described herein, Defendant and its RICO Co-Conspirators engaged in a pattern of related and continuous predicate acts for years.   The predicate acts constituted a variety of unlawful activities, each conducted with the common purpose of obtaining significant monies and revenues from Plaintiffs and Class members

based on their misrepresentations, while providing to Plaintiffs and Class members Defendant's tuna products that were worthless, worth significantly less than the purchase price paid, or that consumers would simply not have purchased at all but for the conspiracy.   The predicate acts also had the same or similar results, participants, victims, and methods of commission.  The predicate acts were related and not isolated events.

156.   The predicate acts had the purpose of generating significant revenue and profits for Defendant and its RICO Co-Conspirators at the expense of Plaintiffs and Class members. The predicate acts were committed or caused to be committed by Defendant and its RICO Co-Conspirators through their participation in the Dolphin-Unsafe RICO Enterprise and in furtherance of its fraudulent scheme, and were interrelated in that they involved obtaining Plaintiffs' and Class members' funds and avoiding the expenses associated with using fishing methods that permit the capture of tuna sustainably sourced without harming the dolphin population.

157.   During the procurement, processing, packaging, labeling, distribution, marketing, and sale of Defendant's tuna products, Defendant and its RICO Co-Conspirators shared among themselves logistical, marketing, and financial information that revealed the existence of the fishing practices employed that prevent Defendant's tuna products from being marketed and sold as "Dolphin Safe", sustainably sourced, and in compliance with federal laws and regulations. Nevertheless, Defendant and its RICO Co-Conspirators chose and agreed to disseminate information that deliberately misrepresented Defendant's tuna products as "Dolphin Safe" and sustainably sourced in their concerted efforts to market and sell them to consumers.

158.   By reason of, and as a result of the conduct of Defendant and its RICO Co-Conspirators, and in particular, their pattern of racketeering activity, Plaintiffs

and Class members have been injured in their business and/or property in multiple ways, including but not limited to:

(a) purchase of falsely advertised tuna products; and

(b) payment at the time of purchase for falsely advertised tuna products purportedly being "Dolphin Safe," sustainably sourced, and meeting applicable federal laws and regulations, that were not capable of being sold as "Dolphin Safe" and sustainably sourced.

159.   Defendant's and its RICO Co-Conspirators' violations of 18 U.S.C. §§1962(c) and (d) have directly and proximately caused economic damage to Plaintiffs' and Class members' business and property, and Plaintiffs and Class members are entitled to bring this action for three times their actual damages, as well as injunctive/equitable relief, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c).

**COUNT II –**
**Violation of California Business & Professions Code §§17200, *et seq.***
**(On Behalf of the California-Only Class)**

160.   Plaintiff Myers repeats and re-alleges the allegations contained in paragraphs 1 through 85 above, as if fully set forth herein.

161.   Plaintiff Myers brings this claim individually and on behalf of the California-Only Class.

162.   The Unfair Competition Law, Business & Professions Code §17200, *et seq.* ("UCL") prohibits any "unlawful," "fraudulent," or "unfair" business act or practice and any false or misleading advertising.   More specifically, the UCL provides, in pertinent part: "Unfair competition shall mean and include unlawful, unfair, or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising . . .."

163.   **<u>Unlawful Business Practices:</u>** In the course of conducting business, Defendant committed "unlawful" business practices in violation of the UCL by, *inter*

*alia*, making the dolphin safe representations and sustainable fishing methods representations, which are false, misleading, and/or deceptive (which also constitute advertising within the meaning of §§17200); failing to comply with storage, traceability, and verification requirements, as set forth more fully herein; violating California Civil Code §§1572, 1573, 1709, and 1711; the California Legal Remedies Act, California Civil Code §§1750, *et seq.*; California Business & Professions Code §§17200, *et seq.*, 17500, *et seq.*, and 17580, *et seq.*; and 16 U.S.C. §1385.

164.    Plaintiff Myers reserves the right to allege other violations of law, which constitute other unlawful business acts or practices. Such conduct is ongoing and continues to this date.

165.    **Unfair Business Practices:** In the course of conducting business, Defendant committed "unfair" business acts or practices by, *inter alia*, making the dolphin safe representations and sustainable fishing methods representations which are false, misleading, and/or deceptive (which also constitute advertising within the meaning of §17200), and failing to comply with storage, traceability, and verification requirements, as set forth more fully herein.  There is no societal benefit from false advertising, only harm. While Plaintiff Myers and the public at large were and continue to be harmed, Defendant has been unjustly enriched by its false, misleading, and/or deceptive representations as it unfairly enticed Plaintiff Myers and California-Only Class members to purchase its Fancy Feast tuna products instead of similar tuna products sold by other manufacturers that were dolphin safe, sustainably caught, stored separately from any non-dolphin safe tuna, traceable, and verified.  Because the utility of Defendant's conduct (zero) is outweighed by the gravity of harm to Plaintiffs, consumers, and the competitive market, Defendant's conduct is "unfair" having offended an established public policy embodied in, among other things, 16 U.S.C. §1385, where Congress expressly found that it is the policy of the United States to protect dolphin populations and that "consumers would like to know if the

tuna they purchase is falsely labeled as to the effect of the harvesting of the tuna on dolphins." 16 U.S.C. §§1385(b)(2)-(3).

166. Defendant also engaged in immoral, unethical, oppressive, and unscrupulous activities that are substantially injurious to the public at large.

167. There were reasonably available alternatives to further Defendant's legitimate business interests, other than the conduct described herein.

168. **Fraudulent Business Practices:** In the course of conducting business, Defendant committed "fraudulent business act[s] or practices" and deceptive or misleading advertising by, *inter alia*, making the dolphin safe representations and sustainable fishing methods representations, which are false, misleading, and/or deceptive to reasonable consumers, and by failing to comply with storage, traceability, and verification requirements, regarding the Products as set forth more fully herein.

169. Defendant's actions, claims, and misleading statements, as more fully set forth above, are misleading and/or likely to deceive the consuming public within the meaning of Business & Professions Code §§17200, *et seq*.

170. Plaintiff Myers relied on Defendant's dolphin safe representations and compliance with traceability and verification requirements and were in fact injured as a result of those false, misleading, and deceptive representations and by Defendant's failure to comply with storage, traceability, and verification requirements.

171. As alleged herein, Plaintiff Myers has suffered injury in fact and lost money or property at the time of purchase as a result of Defendant's conduct because she was exposed to and purchased Defendant's Fancy Feast tuna products in reliance on the dolphin safe representations and sustainable fishing methods representations, and Defendant's compliance with storage, tracking, and verification requirements, but did not receive Fancy Feast tuna products that contain tuna caught using fishing

methods that do not harm dolphins.

172.   Unless restrained and enjoined, Defendant will continue to engage in the above described conduct. Accordingly, injunctive relief is appropriate.

173.   Plaintiff Myers, on behalf of herself, all others similarly situated, and the general public, seek declaratory relief and an injunction prohibiting Defendant from continuing such practices, corrective advertising, restitution of all money obtained from Plaintiff Myers and California-Only Class members collected as a result of unfair competition, and all other relief this Court deems appropriate, consistent with Business & Professions Code §17203.

**COUNT III**
**Violations of the Consumers Legal Remedies Act – Cal. Civ. Code §§ 1750, *et seq*.**
**(On Behalf of the California-Only Class)**

174.   Plaintiff Myers repeats and incorporates by reference the allegations contained in the paragraphs 1 through 85 above as if fully set forth herein.

175.   Plaintiff Myers brings this claim individually and on behalf of the California-Only Class.

176.   This cause of action is brought pursuant to the Consumers Legal Remedies Act, California Civil Code §§1750, *et seq*. (the "CLRA").

177.   Plaintiff Myers is a consumer as defined by California Civil Code §1761(d). The Fancy Feast tuna products are "goods" within the meaning of the CLRA.

178.   Defendant violated and continues to violate the CLRA by engaging in the following practices proscribed by California Civil Code §1770(a) in transactions with Plaintiff Myers and the California-Only Class which were intended to result in, and did result in, the sale of the Products:

(5)   Representing that [the Products have] . . . characteristics, . . . uses [and] benefits . . . which [they do] not have . . . .

- 61 -
First Amended Class Action Complaint

1                                    *    *    *

2          (7)  Representing that [the Products] are of a particular standard, quality,

3                or grade … if they are of another.

4          179.  Pursuant to California Civil Code §1782(d), Plaintiff Myers and the

5    California-Only Class seek a Court Order declaring Defendant to be in violation of

6    the CLRA, enjoining the above-described wrongful acts and practices of Defendant,

7    and ordering restitution and disgorgement.

8          180.  Pursuant to §1782 of the CLRA, Plaintiff Myers notified Defendant in

9    writing by certified mail of the particular violations of §1770 of the CLRA and

10   demanded that Defendant rectify the problems associated with the actions detailed

11   above and give notice to all affected consumers of Defendant's intent to so act.

12         181.  Defendant failed to rectify or agree to rectify the problems associated

13   with the actions detailed above and give notice to all affected consumers within 30

14   days of the date of written notice pursuant to §1782 of the CLRA. Thus, Plaintiff

15   Myers further seeks actual, punitive, and statutory damages as appropriate.

16                                    **COUNT IV-**
17        **Violations of the New York General Business Law §349**
                  **(On Behalf of the New York-Only Class)**

18         182.  Plaintiffs Cullen and Mouganis (the "New York Plaintiffs") repeat and

19   incorporate by reference the allegations contained in the paragraphs 1 through 85

20   above as if fully set forth herein.

21         183.  The New York Plaintiffs bring this claim individually and on behalf of

22   the New York-Only Class.

23         184.  Defendant's actions alleged herein constitute unlawful, unfair, and

24   deceptive business practices.  Those actions include misrepresenting that the tuna

25   products are "Dolphin Safe" when they are not.

26         185.  Defendant's conduct constitutes acts, uses and/or employment by

27   Defendant or its agents or employees of deception, fraud, unconscionable and unfair

28                                    - 62 -

commercial practices, false pretenses, false promises, misrepresentations and/or the knowing concealment, suppression, or omission of material facts with the intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of goods in violation of §349 of New York's General Business Law.

186.   Defendant's deceptive conduct was generally directed at the consuming public.

187.   Defendant's unfair and deceptive trade acts and practices in violation of §349 of New York's General Business Law have directly, foreseeably, and proximately caused damages and injury to the New York Plaintiffs and other members of the New York-Only Class.

188.   Defendant's deceptive conduct has caused harm to New York-Only Class members in that they purchased the tuna products when they otherwise would not have absent Defendant's deceptive conduct.

189.   Defendant's violations of §349 of New York's General Business Law threaten additional injury to the New York-Only Class members if the violations continue.

190.   The New York Plaintiffs, on their own behalf and on behalf of the New York-Only Class, seek damages, injunctive relief, including an order enjoining Defendant's §349 violations alleged herein, and court costs and attorneys' fees, pursuant to NY Gen. Bus. Law §349.

**COUNT V**
**Unjust Enrichment/Quasi-Contract**

191.   Plaintiffs repeat and re-allege the allegations contained in paragraphs 1 through 85 above, as if fully set forth herein.

192.   Plaintiffs and Class members conferred a benefit on Defendant by

1    purchasing the Fancy Feast tuna products.

2        193.   Defendant appreciated and/or realized the benefits in the amount of the

3    purchase price it earned from sales of the Fancy Feast tuna products to Plaintiff and

4    Class members or, at a minimum, the difference between the price it was able to

5    charge Plaintiffs and Class members for the Fancy Feast tuna products with the

6    dolphin safe representations and sustainable fishing method representations and the

7    price they would have been able to charge absent the same.

8        194.   Defendant has profited from its unlawful, unfair, false, misleading, and

9    deceptive practices and advertising at the expense of Plaintiffs and Class members,

10   under circumstances in which it would be unjust for Defendant to be permitted to

11   retain the benefit.

12       195.   Plaintiffs do not have an adequate remedy at law against Defendant.

13       196.   Plaintiffs and Class members are entitled to restitution of all monies paid

14   for the Fancy Feast tuna products or, at a minimum, the premium paid for the Fancy

15   Feast tuna products.

16                              **PRAYER FOR RELIEF**

17   Wherefore, Plaintiffs pray for a judgment:

18       A.     Certifying the Classes as requested herein;

19       B.     Issuing an order declaring that Defendant has engaged in unlawful,

20   unfair, and deceptive acts and practices in violation of the consumer fraud laws in the

21   certified states;

22       C.     Enjoining Defendant's conduct and ordering Defendant to engage in a

23   corrective advertising campaign;

24       D.     Awarding restitution of Defendant's revenues to Plaintiffs and the

25   proposed Class members;

26       E.     Awarding the Classes damages, including statutory and punitive

27   damages, and interest thereon;

28
                                    - 64 -
                        First Amended Class Action Complaint

F.     Awarding attorneys' fees and costs; and

G.     Providing such further relief as may be just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiffs hereby demand a trial of their claims by jury to the extent authorized by law.

Dated:  June 28, 2019                     BONNETT, FAIRBOURN, FRIEDMAN
                                                         & BALINT, P.C.

                                                   /s/ *Patricia N. Syverson*
                                                  Patricia N. Syverson (203111)
                                                  Manfred P. Muecke (222893)
                                                  600 W. Broadway, Suite 900
                                                  San Diego, California 92101
                                                  psyverson@bffb.com
                                                  mmuecke@bffb.com
                                                  Telephone:  (619) 798-4593

                                                  BONNETT, FAIRBOURN, FRIEDMAN &
                                                  BALINT, P.C.
                                                  Elaine A. Ryan (*To Be Admitted Pro Hac Vice*)
                                                  Carrie A. Laliberte (*To Be Admitted Pro Hac Vice*)
                                                  2325 E. Camelback Rd., Suite 300
                                                  Phoenix, AZ 85016
                                                  eryan@bffb.com
                                                  claliberte@bffb.com
                                                  Telephone:  (602) 274-1100

                                                  GOLDMAN SCARLATO & PENNY P.C.
                                                  Brian D. Penny (*Admitted Pro Hac Vice*)
                                                  penny@lawgsp.com
                                                  8 Tower Bridge, Suite 1025
                                                  161 Washington Street
                                                  Conshohocken, Pennsylvania 19428
                                                  Telephone:  (484) 342-0700

                                                  ZAREMBA BROWN PLLC
                                                  Brian M. Brown (*To Be Admitted Pro Hac Vice*)
                                                  bbrown@zarembabrown.com
                                                  40 Wall Street, 52nd Floor
                                                  New York, NY 10005
                                                  Telephone: (212) 380-6700

                                                  ROBBINS GELLER RUDMAN & DOWD LLP
                                                  Stuart A. Davidson (*Admitted Pro Hac Vice*)
                                                  Christopher C. Gold (*Admitted Pro Hac Vice*)
                                                  Bradley M. Beall (*Admitted Pro Hac Vice*)
                                                  sdavidson@rgrdlaw.com
                                                  cgold@rgrdlaw.com

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

bbeall@rgrdlaw.com
120 East Palmetto Park Road, Suite 500
Boca Raton, FL  33432
Telephone:  (561) 750-3000

*Attorneys for Plaintiffs*

- 66 -
First Amended Class Action Complaint

**CERTIFICATE OF SERVICE**

I hereby certify that on June 28, 2019, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the Electronic Mail notice list, and I hereby certify that I have mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the Manual Notice list.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed the 28th day of June 2019.

/s/ *Patricia N. Syverson*
Patricia N. Syverson